(141 P.3d 1180)
No. 94,666

CHRISTOPHER SEEBER, *Appellant,* v. JOHN EBELING, M.D., *Appellee.*

Opinion filed September 1, 2006.

*J. Todd Hiatt, Eugene B. Ralston,* and *Kevin L. Diehl,* of Ralston, Pope & Diehl, L.L.C., of Topeka, for appellant.

*Nathan D. Leadstrom* and *Wayne T. Stratton,* of Goodell, Stratton, Edmonds & Palmer, L.L.P., of Topeka, for appellee.

Before RULON, C.J., GREEN and GREENE, JJ.

GREEN, J.: In this medical malpractice action, Christopher Seeber appeals from the trial court's grant of summary judgment in favor of Dr. John Ebeling. The trial court found that because no physician-patient relationship was created between Ebeling and Seeber, Seeber was unable to establish the duty element of his negligence claim. First, Seeber contends that independent of the duty that flows from a physician-patient relationship, Ebeling owed a duty to him under § 324A of the Restatement (Second) of Torts (1965) based on public policy considerations. Nevertheless, the uncontroverted evidence in this case established that the only duty owed by Ebeling, as an on-call physician, was to be available for consultation, which he fulfilled in this case. We decline to extend § 324A of the Restatement (Second) of Torts to require Ebeling to come into the hospital and treat a patient when no physician-patient relationship has been formed. Kansas law requires the existence of a physician-patient relationship in order to establish the duty owed by a physician to a patient in a medical malpractice action. Therefore, Seeber's argument fails.

Next, Seeber argues that the trial court erred in determining that no physician-patient relationship had been established between Ebeling and him. We disagree. Because Seeber failed to bring forth any evidence which could establish that Ebeling consented either expressly or impliedly to treat Seeber, Seeber failed to show the existence of a physician-patient relationship. In the absence of such a relationship, Seeber is unable to establish a duty on the part of Ebeling. Accordingly, we affirm.

Seeber was injured in an automobile accident that occurred at approximately 4:00 during the afternoon of June 7, 2001, near Olivet, Kansas. At the time, Seeber's niece, whom Seeber was teaching to drive, was driving the car, and Seeber was a passenger. While driving down a dirt road, the car began to fishtail. Despite Seeber's efforts to grab the steering wheel to regain control, the car swerved into a ditch. Seeber was ejected from the car approximately 20 feet. Seeber lost consciousness during the accident and woke up lying on his back on a grassy hill. As a result of the accident, Seeber suffered a spinal cord injury and fractures to his neck.

Seeber was airlifted to St. Francis Regional Medical Center (St. Francis) where he arrived at approximately 5:40 p.m. When he arrived at St. Francis, Seeber could not move his hands or legs. Nevertheless, he could perceive gross sensation in all of his extremities. Seeber was seen by St. Francis emergency room physician, Dr. Randall McAllister. After evaluating Seeber, McAllister determined that Seeber needed neurosurgical care.

The notes from the emergency department indicate that at approximately 8:05 p.m., Seeber was able to feel his feet but was unable to use them. At that time, Seeber also had decreased sensation in his feet. Moreover, the left side of his trunk had better sensation than the right side. At approximately 8:15 p.m., more than 2½ hours after Seeber arrived at St. Francis, McAllister paged Ebeling, the neurosurgeon on-call at the time. Ebeling returned McAllister's call at 8:20 p.m. During the phone call, McAllister gave Ebeling information concerning Seeber's patient history, his physican, and pertinent studies. McAllister explained to Ebeling that Seeber had a spinal cord injury and a cervical spine fracture. Ebeling told McAllister that he was very fatigued and would not be able to come into the hospital. Ebeling suggested that McAllister contact orthopedic surgeon Dr. Mike Smith. McAllister placed a call to Smith at approximately 8:21 p.m. which was returned by Smith's associate, Dr. Polly, at approximately 8:55 p.m. Because Smith was not available and because Polly did not handle spinal cord injuries, Polly refused the case.

Ebeling called McAllister again at approximately 8:45 p.m. At that time, McAllister requested that Ebeling evaluate Seeber. Mc-

Allister told Ebeling that if he refused to see Seeber, Seeber would need to be transferred to another hospital. Ebeling refused to see Seeber and recommended that McAllister call the University of Kansas Medical Center.

This incident was the only one that Ebeling could remember where he had been too fatigued to attend to a patient when he was on-call. Ebeling testified that he did not feel like he was sufficiently at the top of his game to take care of Seeber. Ebeling indicated that he was feeling run-down because he had been an on-call physician every third night for more than 10 years. According to Ebeling, he made a judgment call that Seeber would be better off at a trauma center that had a trauma team and a fresher surgeon. Ebeling testified that neither St. Francis nor Stormont-Vail in Topeka had a trauma designation. McAllister testified that in his 20-plus years of practice in emergency medicine in three states, that was the only time he could remember that an on-call physician could not respond due to fatigue.

Ebeling indicated that there was no defined contract or agreement as to the conditions or the frequency of his on-call status. Instead, it was just customary that Ebeling would be an on-call physician every third day and would be available to consult with the physician in the emergency departments at St. Francis and another hospital in Topeka concerning patients with neurological conditions. There were only three neurosurgeons in Topeka available to be on-call, which included Ebeling and the other two partners in Ebeling's group. When questioned about whether there were any staff rules or protocol concerning on-call physicians, Ebeling testified that they were required to respond within a reasonable time upon being contacted. No other evidence concerning staff rules or protocols is contained in the record on appeal. Ebeling testified that "on-call" means that he was available for consultation. When Ebeling was "on-call," he would typically either come to the hospital to examine the patient and make recommendations, and diagnoses, treatment plans or have discussions with the patient or another physician who called him with questions.

After speaking with Ebeling for the second time, McAllister made arrangements for Seeber to be transferred to the University

of Kansas Medical Center. Seeber was transferred to the University of Kansas Medical Center at approximately 10:40 p.m. Seeber arrived at the University of Kansas Medical Center shortly before midnight. Upon his arrival, Seeber had no sensation in his lower extremities. At the University of Kansas Medical Center, physicians determined that Seeber had a C7 fracture with complete paraplegia. Seeber underwent surgery on the morning of June 8, 2001.

Seeber filed suit against Dr. Ebeling, Dr. McAllister, and St. Francis, claiming that the medical and other care rendered by the defendants was negligent. Seeber claimed that as a result of the defendants' negligence, he suffered physical and emotional injuries that were permanent and progressive. Dr. Ebeling responded to Seeber's petition by asserting that he had never provided medical treatment to Seeber and was not negligent.

Based upon Seeber's request, St. Francis and McAllister were later dismissed from the action without prejudice. Thereafter, Ebeling moved for summary judgment. Ebeling contended that Seeber had failed to present any evidence that a physician-patient relationship existed between Ebeling and Seeber. Ebeling asserted that the undisputed evidence showed that he declined to accept Seeber as his patient and, therefore, owed no duty to him. In addition, Ebeling argued that even if he owed a duty to Seeber, Seeber had failed to present any expert testimony that the standard of care for a neurosurgeon "required immediate surgery and that delaying the surgery until it was performed at KU Medical Center was a breach of such standard of care."

Seeber responded by arguing that Ebeling owed a duty to him based on public policy and § 324A of the Restatement (Second) of Torts. Seeber contended that there should be a duty on the part of an on-call physician to notify appropriate hospital personnel that he or she is unavailable for on-call status. In addition, Seeber alleged that he had established a question of fact as to the existence of a physician-patient relationship between Ebeling and him. Moreover, Seeber contended that he had established that Ebeling's negligent conduct in failing to advise the hospital staff of his unavailability resulted in injury and damages to Seeber.

Seeber designated Dr. Neil Allen and Dr. John Zautcke as his medical experts in this case. Seeber's only expert on the standard of care was Zautcke. According to Zautcke, Ebeling had a duty and responsibility to come to St. Francis and consult on Seeber if possible. If Ebeling was unable to perform the necessary operation, he had a duty to find alternate coverage. If Ebeling could not find alternate coverage, he should have contacted St. Francis administration to inform them that no neurosurgical coverage was available. Zautcke indicated that the problem in finding a consultant delayed Seeber's treatment. Nevertheless, Zautcke could not say whether the delay caused or contributed to Seeber's poor neurologic outcome.

According to Allen, he was neither an emergency room physician nor a neurologist and could not testify to the standard of care applicable to those doctors. Allen limited his testimony to the issues of causation and damages. Allen testified that had Seeber been treated in a more efficient manner and transferred directly from the field to the University of Kansas Medical Center because no neurosurgeon was available to treat him, Seeber "would have had a better response and better outcome of his neurological condition in so far as the ability to perceive sensation in the lower extremities and, indeed, possibly an improvement in motion of the lower extremities." Allen, however, could not say how much the improvement would have been. In addition, Allen stated that Seeber's fine motor movement in his upper hands could have been considerably improved if the treatment had been more efficient.

The trial court determined that because no physician-patient relationship had been created between Ebeling and Seeber, Ebeling owed no duty to Seeber. The trial court granted summary judgment in favor of Ebeling.

*Standard of Review*

This court's standard of review in summary judgment cases is well established:

" ' "Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is

entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied." [Citations omitted.]' " *State ex rel. Stovall v. Reliance Ins. Co.*, 278 Kan. 777, 788, 107 P.3d 1219 (2005).

"[S]ummary judgments are to be granted with caution in negligence actions. [Citation omitted.]" *Fettke v. City of Wichita*, 264 Kan. 629, 632, 957 P.2d 409 (1998). Nevertheless, a defendant moving for summary judgment in a negligence case is entitled to prevail if the defendant shows the plaintiff's claim is supported by no evidence indicating negligence. *Crooks v. Greene*, 12 Kan. App. 2d 62, 64-65, 736 P.2d 78 (1987). "Negligence is never presumed and may not be inferred merely from a lack of success or an adverse result from treatment." *Bacon v. Mercy Hosp. of Ft. Scott*, 243 Kan. 303, 307, 756 P.2d 416 (1988).

*Elements of Medical Malpractice*

"A medical malpractice claim requires the same elements of proof as any negligence action: (1) the existence of a duty; (2) breach of that duty; (3) injury; and (4) a causal connection between the duty breached and the injury suffered. [Citation omitted.]" *Watkins v. McAllister*, 30 Kan. App. 2d 1255, 1258, 59 P.3d 1021 (2002). Whether a duty exists presents a question of law. Whether the duty has been breached presents a question of fact. *Walters v. St. Francis Hosp. and Med. Center, Inc.*, 23 Kan. App. 2d 595, 597, 932 P.2d 1041, *rev. denied* 262 Kan. 970 (1997).

The plaintiff in a medical malpractice action has the burden of proof to establish the elements of the negligence claim. The existence of a duty of care in a medical malpractice action is dependent on the existence of a physician-patient relationship. The existence of a physician-patient relationship is generally a question of fact for the jury. Nevertheless, summary judgment may be considered on the existence of a physician-patient relationship where the facts are

shown by evidence which is clear, palpable, and undisputed and would lead the jury to only one conclusion. *Irvin v. Smith*, 272 Kan. 112, 119, 31 P.3d 934 (2001).

*I. Did Ebeling owe Seeber a duty under Restatement (Second) Torts § 324A?*

Seeber contends that independent of the duty that flowed from the physician-patient relationship, Ebeling owed a duty to him under Restatement (Second) of Torts § 324A. Whether a duty exists is a question of law. *Nold v. Binyon*, 272 Kan. 87, 103, 31 P.3d 274 (2001).

Restatement (Second) of Torts § 324A states:

"§ 324A. Liability to Third Person for Negligent Performance of Undertaking

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

"(a) his failure to exercise reasonable care increases the risk of such harm, or

"(b) he has undertaken to perform a duty owed by the other to the third person, or

"(c) the harm is suffered because of reliance of the other or the third person upon the undertaking."

Citing *Schmeck v. City of Shawnee*, 232 Kan. 11, 651 P.2d 585 (1982), and *Ingram v. Howard-Needless-Tammen and Bergendoff*, 234 Kan. 289, 672 P.2d 1083 (1983), Seeber points out that our Supreme Court has adopted § 324A of the Restatement (Second) of Torts. Nevertheless, neither of these cases extended § 324A to create a duty on the part of a physician to treat someone whom the physician has refused to take on as a patient. Kelly fails to cite any Kansas case which has extended § 324A of the Restatement (Second) of Torts to create such a duty upon a physician.

At oral arguments, Seeber contended that Ebeling had a duty to come in and treat him, or at least to notify the hospital that he was too fatigued to come in and treat patients, which was independent of any duty grounded in medical malpractice. Nevertheless, even if Restatement (Second) of Torts § 324A was extended to impose a duty on Ebeling as an on-call doctor in this case, the uncontrov-

erted evidence established that Ebeling fulfilled his on-call duties. No contract existed between Ebeling and St. Francis. Rather, Ebeling's status as an on-call physician arose due to the fact that he was one of only three neurosurgeons available in Topeka. Ebeling's status as an on-call physician meant that he was available for consultation. When Ebeling was on-call, he would typically either: (1) come to the hospital to examine the patient and make recommendations, diagnoses, and treatment plans; or (2) have discussions with the patient or another physician who called him with questions. There was no evidence that as an on-call physician, Ebeling was required to come to the hospital and treat a patient.

The evidence in this case showed that Ebeling was available for consultation on the evening in question and thus fulfilled his duty as an on-call physician. Ebeling called the hospital within 5 minutes of being paged by McAllister. Ebeling listened to information about Seeber's patient history, pertinent studies, and his current status. After hearing this information, Ebeling told McAllister that he was too fatigued and would not be able to come into the hospital to treat Seeber. Ebeling suggested that McAllister contact another surgeon who might be able to treat Seeber. When that surgeon was unavailable, Ebeling recommended that Seeber be transferred to the University of Kansas Medical Center.

Although Seeber suggests that Ebeling had a duty to inform the hospital that he was too fatigued to come into the hospital that evening, Ebeling points out that it is not reasonably foreseeable for a surgeon in his position to know whether he or she will want to or be able to accept a patient without first learning about the patient's condition. Ebeling points out that there is an enormous difference between treating a person with a peripheral nerve injury as opposed to treating the type of injuries sustained by Seeber. Here, after hearing information concerning Seeber's condition and injuries, Ebeling then told McAllister that he was too fatigued to come into the hospital and treat Seeber. Ebeling fulfilled his duty as an on-call physician.

Nevertheless, Seeber argues that the public policy of Kansas should recognize a duty on the part of an on-call physician to notify appropriate hospital personnel of his or her unavailability for on-

call status. To support his argument, Seeber cites *Millard v. Corrado*, 14 S.W.3d 42 (Mo. Ct. App. 2000). In *Millard*, the plaintiffs sued Dr. Corrado, the on-call surgeon at the hospital where Marjorie Millard was taken after an automobile accident, for negligence. On the day of Millard's accident, Corrado was attending a meeting in another town even though he had scheduled himself as an on-call surgeon that day. Corrado had asked Dr. Jolly, who did not have privileges to perform general surgery, to cover for him while he was at the meeting. After Millard's arrival at the hospital, Corrado was paged but failed to call into the hospital. The emergency room physician examined Millard and diagnosed her with internal abdominal bleeding. Ten minutes after the first page, Corrado was paged again but there was still no response. Thereafter, Jolly and another physician examined Millard and determined that she was bleeding internally and needed surgery.

Nearly half an hour after he was paged the second time, Corrado called into the hospital. Thereafter, a decision was made that Millard would be transferred to the University of Missouri Medical Center where there was a trauma team. Millard was transferred and underwent emergency surgery at the University of Missouri Medical Center more than 3 hours after her arrival at the first hospital. In their action against Corrado, the plaintiffs claimed that Millard suffered aggravation of her injuries from the automobile accident and additional injuries from the delay in treatment caused by Corrado's absence. The trial court granted summary judgment in favor of Corrado because the plaintiffs had failed to establish the existence of a physician-patient relationship.

On appeal, the Missouri Court of Appeals reversed the trial court's grant of summary judgment. Recognizing that a physician's duty to a patient in a medical malpractice action ordinarily arises from the physician-patient relationship, the court nevertheless noted that "when the physician's allegedly negligent acts or omission do not involve a matter of medical science, a duty may also exist when public policy favors the recognition of a duty or when the harm is particularly foreseeable." 14 S.W.3d at 46-47. In determining that public policy supported the recognition of a duty, the court looked at a regulation adopted by the General Assembly

2 years after Millard's accident. The regulation required on-call emergency physicians to arrive at the hospital within 30 minutes of being contacted. The court stated that the regulation "evidences a social consensus to ensure that emergency room physicians attend to their patients within a reasonable time, i.e. thirty minutes." 14 S.W.3d at 47. The court noted that the record also showed that when Millard's accident occurred, the hospital expected on-call physicians to respond to calls within 30 minutes.

Furthermore, the court noted that imposing a duty upon physicians to give notice when they cannot fulfill their on-call responsibilities did not place an unreasonable burden on the medical profession and would reduce the chances of future similar incidents. Moreover, the court determined that it was reasonably foreseeable that Corrado's conduct in failing to notify the hospital of his unavailability created a substantial risk of harm to patients such as Millard.

The Missouri Court of Appeals determined that the public policy of Missouri and the foreseeability of harm to patients such as Millard supported a duty flowing from Corrado to Millard. The court held that independent of any duties flowing from a physician-patient relationship, " 'on-call' physicians owe a duty to reasonably foreseeable emergency patients to provide reasonable notice to appropriate hospital personnel when they will be unavailable to respond to calls." 14 S.W.3d at 48. The court further held that physicians who are unable to fulfill their on-call duties must provide notice as soon as practicable upon learning of circumstances that will make them unavailable. In rendering its decision, the court recognized that § 324A of the Restatement (Second) of Torts was consistent with its conclusion:

"While there is no Missouri case law in which Section 324A has been applied in a medical negligence setting, we agree that the Restatement is consistent with our conclusion in this case. Indeed, other jurisdictions have seen fit to apply Section 324A in the context of medical negligence and create the duty as the majority has here—through application of the foundational principles of foreseeability and public policy which apply to all duties rooted in negligence. [Citations omitted.]" 14 S.W.3d at 48.

Different from the facts of *Millard*, Ebeling did not sign up to be on-call. Rather, his on-call status arose by custom due to the

fact that he was one of only three neurosurgeons in Topeka. The evidence further indicates that when Ebeling was on-call, he was on-call for two hospitals in Topeka. He was not solely on-call for St. Francis. Further, when Ebeling received McAllister's call, he responded within a reasonable time, heard information concerning Seeber's condition and injuries, and then told McAllister that he was too fatigued to treat Seeber. This situation is different from *Millard* where the on-call physician was out of town and could not possibly come into the hospital to treat a patient even if the physician felt that he could handle the treatment.

Moreover, another important distinction exists between *Millard* and the instant case: Seeber has not pointed to any regulation, law, or policy which would establish a "social consensus" in Kansas that on-call physicians must come to the hospital within a reasonable time after they are called. Moreover, Seeber has failed to point to any authority which would indicate that based on the public policy in Kansas, a duty should be imposed upon a physician who is on-call to come into the hospital and treat a patient. To extend such a requirement to an on-call physician would have a chilling effect on the profession. Physicians would not want to volunteer to receive calls from hospitals if a physician could be required to come into the hospital and treat a patient even though the physician did not feel competent to handle a particular case.

Kansas law has consistently required the existence of a physician-patient relationship to establish the duty of care in a medical malpractice action against a physician. Our Supreme Court has explicitly stated that in a medical malpractice action "[t]he existence of the duty of care is dependent on the existence of a physician-patient relationship." *Irvin*, 272 Kan. 112, Syl. ¶ 2. Moreover, in *Nold*, 272 Kan. at 108, our Supreme Court stated: "A duty arises and liability may be imposed only for negligence occurring during the doctor-patient relationship." Compare *Peace v. Weisman*, 186 Ga. App. 697, 698, 368 S.E.2d 319 (1988) (no liability for malpractice in absence of physician-patient privilege; doctor-patient privity is essential because it establishes duty to conform to standard of conduct).

Ebeling points out that this court in *Estate of Beckner v. Jensen*, 29 Kan. App. 2d 129, 24 P.3d 169 (2001), has rejected the public policy rationale similar to that used in *Millard.* In *Beckner*, Beckner's estate sued parents hosting an after-prom sleepover after Beckner was killed by one of the individuals driving home from the sleepover. The estate sought to impose a duty upon the parents, claiming that a special relationship existed between Beckner and the parents and that a duty existed under §§ 315 and 318 of the Restatement (Second) of Torts (1965). The estate also sought to impose a duty under § 324A of the Restatement (Second) of Torts or based on general public policy considerations as found in *Robinson v. Health Midwest Development Group d/b/a Lafayette Regional Health Center*, Mo. App. W.D. No. 58290 filed March 6, 2001, *rev'd on other grounds* 58 S.W.3d 519 (Mo. 2001). The *Robinson* case was later transferred to the Missouri Supreme Court, which affirmed the district court and avoided deciding the public policy issue. Although the Court of Appeals' decision in *Robinson* was withdrawn from publication, a brief discussion of this court's rejection of the public policy rationale used in that decision is helpful here. In *Robinson*, the Missouri Court of Appeals determined that although no special relationship existed between a physician and the general public which would impose a duty, the public policy factors set forth in *Hoover's Dairy, Inc. v. Mid-America Dairymen*, 700 S.W.2d 426, 431-32 (Mo. 1985), gave rise to a duty in that case. The public policy factors set forth in *Hoover's Dairy* were also relied upon in *Millard.*

This court in *Beckner* rejected the estate's theories of liability against the parents. In rejecting *Robinson* and the public policy considerations for imposing a duty on the parents, this court stated that "Kansas case law and public policy, however, is contrary to the position taken by the Missouri Court of Appeals in *Robinson.*" *Beckner*, 29 Kan. App. 2d at 137. Moreover, this court discussed *Calwell v. Hassan*, 260 Kan. 769, 925 P.2d 422 (1996), where our Supreme Court held that no special relationship existed and declined to extend § 324A to the facts of the case. This court concluded:

"Because our Supreme Court found no duty under very similar facts, *Robinson* is not persuasive to establish liability on account of public policy. Moreover, *Robinson's* persuasiveness is diminished because it reached the result by relying on *Hoover's Dairy, Inc.*, a Missouri Supreme Court case, and by analogy to a dram-shop statute for which there are no counterparts in Kansas. [Citation omitted.] As a result, Beckner's argument fails." *Beckner*, 29 Kan. App. 2d at 138.

Seeber has failed to cite any Kansas cases which have used the rationale in *Millard* to impose a duty in a medical malpractice action based upon public policy considerations. Ebeling points out that our Supreme Court has routinely prevented attempts to convert a malpractice claim into another cause of action. For instance, in *Dawson v. Prager*, 276 Kan. 373, 389, 76 P.3d 1036 (2003), our Supreme Court upheld the trial court's decision that where the plaintiff's allegations stated a cause of action for medical malpractice, her allegations remained an action for medical malpractice and not one for outrage. *Dawson* cited *Bonin v. Vannaman*, 261 Kan. 199, 929 P.2d 754 (1996), "which disapproved theories of recovery against a physician to the extent they are connected with plaintiff's allegations of defendant's failure to maintain the medical standard of care." 276 Kan. at 389.

Kansas law is clear that the duty of care in a medical malpractice action against a physician is based on the existence of a physician-patient relationship. The public policy rationale in *Millard* extending a duty of care to an on-call physician where no physician-patient relationship has been established is not applicable to this case.

## II. Was a physician-patient relationship established between Ebeling and Seeber?

Seeber contends that the trial court erred in determining that no physician-patient relationship was established between Ebeling and him. Seeber maintains that Ebeling's participation and influence during the 5 hours that Seeber was at St. Francis provided a sufficient basis for finding that a physician-patient relationship existed.

Our Supreme Court in *Irvin* described the physician-patient relationship as follows:

"Generally, a physician-patient relationship is created only where the physician personally examines the patient. [Citation omitted.] A physician's indirect contact with a patient, however, does not preclude the finding of a physician-patient relationship. [Citations omitted.] A physician-patient relationship may be found where a physician is contacted by someone on behalf of the patient. [Citation omitted.] Indeed, an implied physician-patient relationship may be found where the physician gives advice to a patient by communicating the advice through another health care professional. [Citation omitted.]

"A physician who gives an 'informal opinion,' however, at the request of a treating physician, does not owe a duty to the patient because no physician-patient relationship is created. [Citations omitted.] A physician who assumes the role of treating the patient, however, can be liable for medical malpractice. [Citations omitted.]" 272 Kan. at 120-21.

Quoting from *Adams v. Via Christi Regional Med. Center*, 270 Kan. 824, 835, 19 P.3d 132 (2001), our Supreme Court in *Irvin* set forth the foundational requirements for the existence of a physician-patient relationship:

" 'A physician-patient relationship is consensual. Thus, where there is no ongoing physician-patient relationship, the physician's express or implied consent to advise or treat the patient is required for the relationship to come into being. Stated otherwise, the doctor must take some affirmative action with regard to treatment of a patient in order for the relationship to be established.' " 272 Kan. at 121.

In this case, there was no evidence presented that Ebeling assumed the role of treating Seeber. Upon being contacted by McAllister and learning about Seeber's condition, Ebeling immediately informed McAllister that he would not be able to treat Seeber. Ebeling stated that he was very fatigued and would not be able to come into the hospital to treat Seeber. Ebeling suggested that McAllister attempt to contact Dr. Smith to treat Seeber. Nevertheless, Smith was unavailable to treat Seeber. When Ebeling called back to the hospital and was asked by McAllister to evaluate Seeber, Ebeling refused to treat Seeber. Ebeling then recommended that McAllister contact the University of Kansas Medical Center for treatment. Ebeling never consented to treat Seeber. There was no evidence that Ebeling offered any medical advice or assisted in Seeber's treatment plan. Rather, the only evidence presented by the parties is that Ebeling refused from the beginning to treat Seeber.

Ebeling cites *Anderson v. Houser*, 240 Ga. App. 613, 619, 523 S.E.2d 342 (1999), where the Georgia Court of Appeals noted that the mere fact that a physician has agreed to be on-call for consultation does not establish a physician-patient relationship:

"Although a doctor who has agreed to be on-call makes himself available to be consulted regarding a patient's condition, that fact alone does not indicate that the doctor has agreed to establish a doctor-patient relationship with any patient who presents herself to the hospital for diagnosis and treatment. Indeed, there may be many circumstances where an on-call physician who is consulted about a particular patient does not feel competent to diagnose and treat the patient. Clearly, in those circumstances, the mere fact that the doctor has agreed to be on call for consultation does not establish a consensual doctor-patient relationship."

Similar to the discussion in *Anderson*, the fact that Ebeling was the on-call physician the night that Seeber was brought into St. Francis did not establish a consensual physician-patient relationship. When Ebeling was consulted about Seeber's condition, he did not feel competent, that is, he was too fatigued to treat Seeber that evening. He never accepted Seeber as his patient.

In determining that no physician-patient relationship was created between Ebeling and Seeber, the trial court cited *Oja v. Kin*, 229 Mich. App. 184, 581 N.W.2d 739 (1998), as a factually similar case. In *Oja*, Burge was taken to the emergency room at Oakland General Hospital for treatment of a gunshot wound. The resident physician at the hospital contacted Dr. Kin, who was the ear, nose, and throat physician on-call at the hospital that evening, and requested that Kin come into the hospital to assist in Burge's care and treatment. Upon being contacted, Kin told the resident that he was not feeling well and would not come into the hospital. Kin suggested that the resident contact another physician. The resident contacted Kin twice more that night, but Kin refused to assist or come into the hospital. Kin told the resident that she would have to find another physician. Burge was later transferred to another hospital where he died on the operating table the following morning. The personal representative of Burge's estate sued Kin and a surgical group.

The trial court in *Oja* granted summary disposition in favor of Kin. On appeal, the plaintiff argued that she raised a genuine issue

of material fact concerning the existence of a physician-patient relationship between Kin and Burge. In addressing the plaintiff's argument, the Michigan Court of Appeals stated that "a physician-patient relationship is a legal prerequisite to a medical malpractice cause of action. [Citation omitted.]" 229 Mich. App. at 187. The court recognized that "a physician's on-call status alone is insufficient to warrant a finding that the physician impliedly consented to a physician-patient relationship." 229 Mich. App. at 190. Further recognizing that an implied consent to a physician-patient relationship may be found only where a physician has taken some sort of action such as participating in the patient's diagnosis and treatment, the court stated:

"A physician-patient relationship is contractual and requires the consent, express or implied, of both the doctor and the patient. [Citation omitted.] The consent of the patient is generally implied. The question is, Under what circumstances can the doctor's consent be implied? As the panel in *Hill* [*v. Kokosky*, 186 Mich. App. 300, 463 N.W.2d 265 (1990)] properly recognized, merely listening to another physician's description of a patient's problem and offering a professional opinion regarding the proper course of treatment is not enough. Under those circumstances, a doctor is not agreeing to enter into a contract with the patient. Instead, she is simply offering informal assistance to a colleague. At the other end of the spectrum, a doctor who is on call and who, on the phone or in person, receives a description of a patient's condition and then essentially directs the course of that patient's treatment, has consented to a physician-patient relationship. The difficulty arises in determining where, between these two extremes, a physician-patient relationship (and thus a duty) arises. This inquiry is necessarily conducted case by case, but we do not believe that a physician's on-call status alone is enough to support an implied consent to a physician-patient relationship. Thus, we conclude that an implied consent to a physician-patient relationship may be found only where a physician has done something, such as participate in the patient's diagnosis and treatment, that supports the implication that she consented to a physician-patient relationship. We conclude that such participation is necessary for, but by itself does not establish, an implied physician-patient relationship. [Citation omitted.]" 229 Mich. App. at 190-91.

Based on the undisputed evidence presented in *Oja*, the Michigan Court of Appeals held that the defendants did not render any treatment to Burge. The court noted that Kin's only opportunity to treat Burge was during the three phone calls from the resident. Nevertheless, the undisputed evidence showed that Kin never pro-

vided any care, treatment, or advice concerning Burge's condition. Kin never accepted Burge as a patient. The court found that Kin had not taken any action which would support a finding of implied consent.

Alternatively, the plaintiff in *Oja* argued that there was a contractual relationship between Kin and the hospital which, when combined with the hospital bylaws, created a legal duty requiring Kin to respond when he was called or to find another physician who could assume this role. The Michigan Court of Appeals determined that although Kin might have owed such a duty to the hospital, a contract between the hospital and Kin did not necessarily create rights in a third party. Because Burge was not a party to the alleged contract, the plaintiff had no right to enforce such contract unless Burge was an intended third-party beneficiary. Nevertheless, the plaintiff in *Oja* failed to show that Burge was an intended third-party beneficiary of the alleged contract. The court concluded that no duty was owed by the defendant to Burge.

Here, similar to *Oja*, Ebeling's only opportunity to treat Seeber was during the two phone calls that he had with Dr. McAllister. Nevertheless, the undisputed evidence in this case showed that he declined to treat Seeber during both of these telephone calls. There was no evidence that Ebeling provided any advice concerning Seeber's treatment and care. Seeber has not met his burden to bring forth evidence which could show that Ebeling, either expressly or impliedly, consented to treat Seeber. As a result, Seeber has failed to establish the duty element of his medical malpractice claim.

Moreover, different from *Oja*, there was no evidence in this case indicating that a contract existed between St. Francis and Ebeling. In fact, Ebeling testified that no agreement or contract existed between he and St. Francis concerning his on-call status. Rather, Ebeling indicated that his status as the on-call neurosurgeon every third night was set by custom because he was one of only three neurosurgeons in Topeka. Ebeling did indicate that he was supposed to respond within a reasonable time to a call. The evidence established, however, that he did respond within 5 minutes of the time that he was paged. Without any evidence of a contract be-

tween Ebeling and St. Francis and without any other evidence of the terms and conditions of Ebeling's on-call status, any third-party beneficiary analysis as in *Oja* is unwarranted.

*Breach of Standard of Care*

Ebeling also contends that if this court found a duty to treat on the part of Ebeling, this court would still need to consider whether Seeber presented sufficient evidence in the form of expert testimony that the standard of care for a neurosurgeon required immediate surgery and that delaying the surgery until it was performed at the University of Kansas Medical Center was a breach of this standard of care. Because Seeber failed to establish the existence of a physician-patient relationship and thus a duty on the part of Ebeling, it is unnecessary to address this argument any further.

Affirmed.

GREENE, J., concurring: I write separately to express an analytical concern about the majority's discussion of Restatement (Second) of Torts § 324A (1965). Lurking below the surface of the majority's opinion is the question whether physicians should be exempt from liability under this precept. I would hold they should not.

Clearly, this Restatement section has been adopted in Kansas. See *Ingram v. Howard-Needless-Tammen and Bergendoff*, 234 Kan. 289, 294-95, 672 P.2d 1083 (1983). Ebeling argues, however, that "numerous courts have rejected [the] assertion" that "a general negligence claim may lie . . . for neglect of professional duties under the auspices of § 324A . . . in the absence of a physician-patient relationship," citing cases from other jurisdictions but also relying on *Irvin v. Smith*, 272 Kan. 112, 31 P.3d 934 (2001). Although the majority states that Seeber fails to cite any Kansas case which has extended § 324A to create a duty upon a physician, I would emphasize that our Supreme Court has not had the opportunity to address the question.

I realize that our Supreme Court in *Irvin* recognized that *in a medical malpractice case*, the existence of the duty of care is dependent on the existence of a physician-patient relationship. *Irvin*,

272 Kan. at 118-19. As I read *Irvin*, however, the parties did not urge, nor did the court analyze, whether Restatement (Second) of Torts, § 324A would impose a duty *independent* of the traditional duty acknowledged in medical malpractice cases, which requires a physician-patient relationship. I do not think we should exempt any class of potential tort defendants from the liability imposed by the Restatement section. Obviously, my analysis would dictate that, where applicable, there might be two separate claims for relief against a physician, one for traditional medical malpractice negligence, and another for liability under the Restatement section.

Here, I would not require a physician-patient relationship in analyzing whether Ebeling had a duty to Seeber under the Restatement section. Instead, I would apply § 324A to Ebeling just as I would to any other tortfeasor, and I might be inclined to conclude that Ebeling indeed had such a duty. I concur with the majority, however, in concluding that the duty was not breached here because the uncontroverted evidence established that Ebeling fulfilled his limited on-call duties of "consultation."

With due respect to my colleagues in the majority, I depart from the duty analysis (section I) contained in the majority opinion. Physicians should not be exempt for liabilities to third persons for negligent performance of an undertaking under § 324A by reason of a requirement that is wholly inapplicable to a pure § 324A analysis.