**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 7, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

CARMEN TALAVERA, by and
through her next friend, Jacob Prado
Gonzalez, Consul of Mexico,

      Plaintiff-Appellant,

v.

JAMES WILEY, D.O.; NURSE
HOCHU, (or Nurse Jane Doe);
KATHRYN A. PHYFER, M.D.;
ROBERT F. MCINTYRE, M.D.;
LYONEL BENOIT-ROCK, M.D.;
ASSADOLLAH ZAINALI, M.D.; A.
ZAINALI, M.D. RADIOLOGY, P.A.,
JOHN AND/OR JANE DOE(S),

      Defendants-Appellees.

No. 12-3129

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. NO. 2:11-CV-02440-JWL)**

---

Kathleen M. Hagen, Watson & Dameron, LLP, Kansas City, Missouri, for
Appellant.

Lisa A. McPherson (Marcia A. Wood with her on the brief) Martin, Pringle,
Oliver, Wallace & Bauer, L.L.P., Wichita, Kansas, for Appellee James Wiley, and
Adam S. Davis (Mark K. Erickson with him on the brief), Wagstaff and Cartmell,
LLP, Kansas City, Missouri, for Appellee Kathryn A. Phyfer, M.D. (Matthew P.
Sorochty and Anthony M. Singer, Woodard, Hernandez, Roth & Day, LLC,
Wichita, Kansas, on the brief for Appellee Lyonel Benoit-Rock, M.D.; Randall H.
Elam, Law Offices of Randall H. Elam, Wichita, Kansas, on the brief for
Appellee Robert F. McIntrye, M.D.; Shannon L. Holmberg and Michael R.

O'Neal, Gilliland & Hayes, P.A., Hutchinson, Kansas, on the brief for Appellee Assadollah Zainali, M.D. and A. Zainali, Radiology, P.A.) for Appellees.

---

Before **TYMKOVICH**, **GORSUCH**, and **HOLMES**, Circuit Judges.

---

**TYMKOVICH**, Circuit Judge.

---

Carmen Talavera suffered a stroke while visiting a store in November 2007 and incurred permanent disabilities that she attributes to the medical malpractice of personnel at the Southwest Medical Center (SWMC), where she was taken after her stroke. Talavera brought claims against a number of these medical personnel defendants under 28 U.S.C. § 1332, alleging that they should have diagnosed and immediately treated her stroke symptoms with blood-clotting therapy, or, absent that, proceeded with early surgical intervention to prevent damage caused by swelling in her brain.

The district court granted summary judgment, reasoning that—even assuming the medical personnel were negligent—Talavera had failed to demonstrate their negligence caused her injuries.

We hold that the district court did not err. Talavera has failed to: (1) establish a genuine dispute of material fact as to whether she would have qualified for blood-clotting therapy, or (2) show that any doctor owed her a duty of care when this therapy was still a viable treatment option. Further, Talavera

cannot meet her burden of demonstrating she would have benefitted from receiving an earlier surgical intervention for symptoms related to her stroke. Finally, Talavera's argument that the defendants' alleged negligence deprived her of the chance of a better recovery fails because she did not adhere to the requirements of Kansas law in advancing a claim based on this theory.

Accordingly, exercising jurisdiction under 28 U.S.C. § 1291, we AFFIRM.

## I. Background

Around 10:30 p.m. on November 9, 2007, Talavera was found unconscious in a bathroom at a Walmart store in Liberal, Kansas. She soon regained consciousness and was taken by ambulance to the SWMC for what would be her first of three visits to the hospital.

Talavera, a non-citizen who speaks primarily Spanish, arrived at the SWMC around 11 p.m. Upon arrival, Talavera was seen by a nurse who reported Talavera complained of general weakness, a sore throat and ear, and a headache. But before a doctor could examine her, Talavera left the hospital (at about 12:10 a.m.).

A note from one of the on-call nurses reveals that Talavera left the hospital during this visit "AMA" or against medical advice. App. 914. The report explains that Talavera did so because she "doesn't know how to pay for [the] visit [and] feels good enough to go home." *Id*. At this time, Talavera signed a

Spanish-language denial-of-treatment form, though Talavera disputes both whether the form is authentic and whether she knowingly signed it.

Talavera then returned to the SWMC about two hours later, around 2 a.m. This time, the nurse documenting her arrival noted that Talavera continued to complain about general weakness. But Talavera also reported having "tingling" in her fingers. *Id*. at 257. Dr. Wiley, the on-call emergency room physician, examined Talavera at around 2:30 a.m. and, as part of his differential diagnosis, considered a variety of possible causes of Talavera's symptoms, including stroke. After the examination, Dr. Wiley recommended that Talavera undergo a number of tests, including a CT scan of her head, which was performed at 4:02 a.m.

Dr. Wiley ultimately ruled out a stroke because the scan "was negative." *Id*. at 615.[1] Instead of stroke, Dr. Wiley concluded Talavera was suffering from hypothyroidism and a muscle sprain in her neck. He based this conclusion on his review of Talavera's lab work, which revealed elevated thyroid hormone, and on his examination of Talavera, whom he observed to have an enlarged thyroid. As a result of this diagnosis, Dr. Wiley prescribed medication to treat hypothyroidism

---

[1] There was no radiologist available to analyze the CT scan at the time it was performed, and Dr. Wiley is not clinically qualified to read such scans. Dr. Wiley stated in his deposition that the typical practice for interpreting a CT scan under such circumstances was to have it analyzed by an outside radiology company. Dr. Wiley had no independent memory of a radiologist interpreting the CT scan before Talavera was discharged at the end of this visit, and we find nothing in the record corroborating Dr. Wiley's claim that the scan was reviewed prior to the end of Talavera's second visit.

and made arrangements for Talavera to see her primary care physician. Talavera was discharged from the SWMC at 5:49 a.m.

A few hours later, at approximately 10:30 a.m. on November 10, Dr. Assadollah Zainali, a radiologist at the SWMC, reviewed Talavera's CT scan. He initially interpreted the scan to show "no cerebral infarction or hemorrhage" and noted that the scan was "unremarkable." *Id*. at 921. Dr. Zainali later conceded that his initial analysis was erroneous: the CT scan in fact revealed that Talavera had suffered an "ischemic infarct," which is a type of brain injury caused by stroke. *Id*. at 659.

Talavera's third and final visit to the SWMC began around 3:45 p.m. on November 10, when paramedics brought her to the emergency room after they received a call that Talavera had passed out at her home. A nurse who examined Talavera at the beginning of this third visit noted Talavera had hypothyroidism and was moaning and complaining of constant pain in her head.

Shortly after the nurse's examination, Talavera was seen by Dr. Kathryn Phyfer, the on-duty emergency-room physician. Like Dr. Wiley, Dr. Phyfer ultimately concluded that Talavera was suffering from hypothyroidism. She recommended Talavera follow up with her primary care physician and start taking thyroid medication. Dr. Phyfer then attempted to have Talavera discharged. During the discharge process, however, Talavera exhibited a number of unusual

-5-

behaviors, which prompted SWMC personnel to perform a mental health screening.

Dr. Laura Noblejas, a clinical psychologist, attempted to administer the screening. Although Dr. Noblejas was unable to perform a complete analysis on Talavera, Dr. Noblejas noted Talavera had been engaging in bizarre behaviors during her three visits to SWMC and identified Talavera as presenting a number of psychological problems that made her a potential danger to herself and others. Based on the recommendations in the mental health screening, Talavera was transferred to the hospital psychiatric ward, where she was placed under the care of Dr. Robert McIntyre, a psychiatrist.

Dr. McIntyre first examined Talavera on the morning of November 11, and she remained under his care and the care of Dr. Lyonel Benoit-Rock, another psychiatrist, for the next two days. Neither psychiatrist was successful at treating or substantially communicating with Talavera. Further, Talavera spent most of her time in the psychiatric ward in bed, where she had become unresponsive to a number of stimuli and had trouble communicating even in Spanish.

On November 14, Talavera was transferred back to the SWMC intensive care unit, this time under the care of Dr. Sharon Mitchell. That same day an MRI of Talavera's brain was performed, which was then interpreted on November 15 and revealed "a massive cerebral infarction noted with massive mass effect," which had caused "total occlusion of the middle cerebral artery." *Id.* at 761.

After determining Talavera had in fact suffered a stroke, Dr. Mitchell initially decided not to transfer Talavera to a larger specialty hospital for treatment and instead prescribed a number of drugs to combat the stroke's effects. After Talavera's clinical picture had deteriorated, however, Dr. Mitchell opted to transfer Talavera to a hospital in Wichita, where it was recommended that Talavera undergo a "large right decompressive hemicraniectomy with durotomy," *id.* at 664, a procedure designed "[t]o relieve pressure inside the skull so that when the brain is swelling[,] . . . the swollen part is not going to press on other parts of the brain and cause neurologic dysfunction and possibly damage," *id.* at 1174. Dr. Nazih Moufarrij, a neurosurgeon, performed the hemicraniectomy on November 16. Talavera was discharged on December 19, 2007, and transferred to a rehabilitation facility. Nonetheless, she suffers from permanent physical and mental disabilities as a result of the stroke.

## II. Analysis

Talavera contends the district court erred in granting summary judgment on all of her claims. We review the district court's grant of summary judgment de novo, viewing the facts in the light most favorable to Talavera and drawing all reasonable inferences in her favor. *See Daniels v. UPS, Inc.*, 701 F.3d 620, 627 (10th Cir. 2012).

### A. *Preliminary Matters*

Before turning to the merits, we must resolve several disagreements about the weight to give certain evidence and the requirements for satisfying elements of the burden of proof under Kansas law.

### 1. Expert Report

The parties disagree about the weight we can give a report submitted by Dr. Helgason, Talavera's expert neurologist. In the report, Dr. Helgason offered opinions as to how she believed the defendants had caused Talavera's injuries. The defendants argue we cannot rely on Dr. Helgason's report because it is inadmissible hearsay and because only sworn expert affidavits or declarations may be used to oppose a summary judgement motion. But the defendants did not move to strike Dr. Helgason's expert report from consideration below, and we see no reason to depart from the general rule that an evidentiary objection not raised in the district court is waived on appeal. *See* Fed. R. Evid. 103(a).

The parties also dispute how to reconcile the various conclusions Dr. Helgason reached in her report with the qualifications she made to those conclusions in response to questions proffered by counsel for the defendants during her deposition. Notwithstanding Dr. Helgason's concessions, Talavera emphasizes the conclusions from Dr. Helgason's earlier written report and suggests that the report by itself creates a genuine issue of material fact.

Talavera cannot create a genuine dispute of material fact solely by relying on a conclusion that was written in an expert report and later qualified during that

expert's deposition. A witness's later qualifications are the relevant "opinions" for purposes of summary judgment unless there is some reason for disregarding them.

Therefore, while we will consider Dr. Helgason's expert report in evaluating whether the district court correctly granted summary judgment to the defendants, we keep in mind that some of the conclusions have been qualified by her deposition testimony. Any doubts we have about these pieces of evidence are resolved in Talavera's favor.

### 2. Burden of Proof for Medical Malpractice under Kansas Law

Next, we must address the application of the burden of proof to Talavera's state law claims. While federal law governs the propriety of the district court's grant of summary judgment, Kansas law governs our analysis of Talavera's underlying tort claims. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Ling v. Jan's Liquors*, 703 P.2d 731, 735 (Kan. 1985) ("The rule in this state is that the law of the state where the tort occurred—*lex loci delicti*—should apply.").

To prevail on a medical malpractice claim in Kansas, a plaintiff must prove: "(1) that a duty was owed by the physician to the patient; (2) that the duty was breached; and (3) that a causal connection existed between the breached duty and the injuries sustained by the patient." *Wozniak v. Lipoff*, 750 P.2d 971, 975 (Kan. 1988).

For medical malpractice cases, a plaintiff must ordinarily meet the burden of proof as to each element through expert medical testimony. *See Maunz v. Perales*, 76 P.3d 1027, 1032 (Kan. 2003); *see also Sharples v. Roberts*, 816 P.2d 390, 398 (Kan. 1991) ("The rule requiring expert medical testimony in medical malpractice actions applies not only to the issue of negligence, but also to the issue of causation. Expert medical testimony is ordinarily required to establish a causal connection between the plaintiff's injuries and the defendant's negligence."). Consequently, if there is no expert medical testimony suggesting the defendants' allegedly negligent conduct caused Talavera's injuries, Talavera cannot prevail on such a claim.[2]

The defendants further suggest that under Kansas law, Talavera must meet her burden of proof as to causation by *disproving* that her injuries derived solely from the stroke she suffered at 10:30 p.m. on November 9, before any defendant had even seen Talavera. In other words, the defendants note that a preexisting condition (i.e., the stroke and its immediate effects) present at the time that Talavera first arrived at the SWMC might have been the sole cause of Talavera's current disabilities, rather than anything that occurred after the defendants owed

---

[2] The Kansas Supreme Court has recognized a "common knowledge" exception to this rule, for instances of egregious malpractice, where "the results are so bad that the lack of reasonable care would be apparent to and within the common knowledge and experience of mankind generally." *Hare v. Wendler*, 949 P.2d 1141, 1147 (Kan. 1997) (quoting *Webb v. Lungstrum*, 575 P.2d 22, 23 (1978)). Talavera does not allege that the defendants' conduct here fits within this exception.

Talavera a duty of care. Defendants fault Talavera for failing to rule out this cause of her present disabilities and suggest that this shortcoming provides an additional basis for granting them summary judgment.

The district court credited this argument, although Kansas law does not clearly support such a defense to liability. First, Kansas law does not definitively establish that the defendants would not be liable for Talavera's injuries if she had a preexisting condition. And even if defendants can claim that a preexisting condition precludes or limits their liability, Kansas law does not establish if the burden stays with Talavera to *disprove* the preexisting condition as the cause-in-fact or if the burden shifts to the defendants to *prove* the alternate cause was the cause-in-fact. There are disagreements among the various state courts on all these questions and compelling arguments to support their differing positions. *See, e.g.*, Dan B. Dobbs et al., The Law of Torts § 195 (2d ed. June 2013 update) (collecting cases).

But given the facts of this case, we need not jump ahead of Kansas courts in resolving these issues here. As we explain below, even if we assume Talavera need not disprove her disabilities were caused by the initial stroke, we must still affirm the district court's grant of summary judgment.

### B. Merits

Talavera advances two theories of negligence. First, she argues the defendants' failure to diagnose her stroke earlier prevented her from benefitting

from thrombolic therapy or tPA, a type of treatment that helps prevent blood clots in stroke victims.  Second, she argues the defendants' failure to diagnose stroke deprived her of receiving an earlier hemicraniectomy, which she alleged would have prevented further physical damage.  In the alternative, Talavera alleges that the defendants' failure to reach an earlier diagnosis deprived her at least of the "loss of a chance" of a better recovery.   "Lost chance" is a legal theory under Kansas law which allows a plaintiff to collect damages for the loss of the *possibility* of a better recovery, even if a more favorable outcome was less than fifty percent likely.

We address in turn below our basis for affirming the district court's judgment on the tPA claim and the hemicraniectomy claim.  We then explain how Talavera has failed to conform to the dictates of "loss of chance" theory under Kansas law and therefore cannot recover under this theory either.

### 1.  tPA Claim

Talavera first claims she was negligently prevented from receiving tPA stroke therapy earlier, which resulted in permanent physical and mental injuries.  As an initial matter, the parties agree about most of the facts relevant to this theory.  First, it is undisputed that at the time Talavera suffered a stroke, tPA treatment was only effective within the first three hours after a stroke's onset.  Second, the parties agree, for purposes of this claim, that the onset of Talavera's stroke occurred in the Walmart bathroom at around 10:30 p.m. on November 9

and thus the three-hour tPA window began to run at this time.[3]  Thus, the parties agree that Talavera's only opportunity for tPA was prior to 1:30 a.m. on November 10 and that tPA was therefore only a viable treatment option before the end of Talavera's first hospital visit.  Consequently, it is undisputed that this claim only applies to Dr. Wiley, who was the only defendant on call and at the SWMC at that time.

We hold that Talavera's tPA claim fails both because Talavera has not established that Dr. Wiley owed her a duty of care during her first hospital visit and, alternatively, because she has not demonstrated, even assuming Dr. Wiley did incur such a duty of care and was negligent, that this negligence caused her injuries.

### a.  Physician-Patient Relationship

As noted above, to prove a medical malpractice claim under Kansas law, a plaintiff must show that a duty was owed by the physician to the patient. *Wozniak*, 750 P.2d at 975.  "Whether a physician owes a legal duty to a patient under a particular circumstance is a question of law.  It is not a question of fact or

---

[3]  As noted above, Talavera had been complaining of a headache for three days prior to her first trip to the emergency room, which would suggest that the three-hour window for tPA might have begun to run before 10:30 p.m on November 9.  Yet Dr. Helgason, in her deposition, noted that in her opinion the onset of stroke symptoms began at 10:30 p.m., when Talavera had passed out in the Walmart bathroom.  The defendants have not contested Dr. Helgason's position and have proceeded from the assumption that Talavera cannot prove liability even assuming that the three-hour clock began to run at this time.

of negligence. Absent the existence of a physician-patient relationship, there can be no liability for medical malpractice." *Irvin v. Smith*, 31 P.3d 934, 942 (Kan. 2001).

"Generally, a physician-patient relationship is created only where the physician personally examines the patient." *Id.* at 941. Nonetheless, "where there is no ongoing physician-patient relationship, the physician's express or implied consent to advise or treat the patient is required for the relationship to come into being." *Adams v. Via Christi Reg'l Med. Ctr.*, 19 P.3d 132, 140 (Kan. 2001). Such exceptions from the general "personal examination" rule arise in situations where, for example, an on-call surgeon fails to respond to repeated calls for his assistance, or where a doctor functions as a consultant for an emergency-room physician directly treating a patient. *Irvin*, 31 P.3d at 941 (collecting authorities and further examples).

Talavera cannot claim that a physician-patient relationship was formed during her first hospital visit based on Dr. Wiley's examination. As noted above, Talavera left the SWMC about an hour after she arrived and before she saw Dr. Wiley.

Given this difficulty, Talavera's argument is that "[t]he black-and-white terms of [Dr. Wiley's] contract with the hospital required him to see, examine and treat plaintiff within 20 minutes of her arrival at the hospital." Rep. Br. at 17.

Thus, reasons Talavera, Dr. Wiley's contract created a physician-patient relationship and establishes the duty he owed to Talavera.

Talavera cites no case in which Kansas courts have explicitly credited a theory that a tort duty for a physician can arise through the physician's contract with a hospital, and we find none.[4]  Nevertheless, courts in other jurisdictions have endorsed such a basis for duty.  *See, e.g.*, *Lownsbury v. VanBuren*, 762 N.E.2d 354, 360 (Ohio 2002) (collecting examples of "courts [that] recognize . . . physicians who practice in the institutional environment may be found to have voluntarily assumed a duty of supervisory care pursuant to their contractual and employment arrangements with the hospital"); *St. John v. Pope*, 901 S.W.2d 420, 424 (Tex. 1995) ("We do not dispute that a physician may agree in advance to the creation of a physician-patient relationship [including duties created through contract]."); Dan B. Dobbs et al., The Law of Torts § 287 (2d ed. Aug. 2012 update) ("[A] physician who contracts with a hospital to supervise hospital

---

[4]  Both parties cite an unpublished opinion from federal district court in Kansas, *Greig v. Botros*, 08-1181-EFM, 2011 WL 890398 (D. Kan. Mar. 14, 2011), in which that court rejected an argument that no duty existed between a plaintiff patient and defendant doctors.  The *Greig* court rejected such an argument in part because the doctors "appear to have had a contractual relationship with the hospital." *Id*. at *4.  The federal district court, however, appears to have relied entirely on cases from outside Kansas in reaching its conclusion.  Further, although Kansas treats the existence of a duty as a question of law, *Irvin*, 31 P.3d at 942, the *Greig* court appears to have treated this as a question of fact, 2011 WL 890398, at *4 ("The court believes that a material issue of fact exists as to whether [the defendant doctors] had a physician-patient relationship with [the patient].").

residents owes the patient the duty created by that undertaking."); *see also Seeber v. Ebeling*, 141 P.3d 1180 (Kan. App. 2006) (holding that a doctor who was on-call for consultations for a hospital but refused to treat a particular patient owed no duty to that patient in part because there was no contract between the hospital and the consultant requiring that the consultant provide treatment).

But we need not resolve any questions about the existence or scope of a contract-based theory of duty in medical malpractice cases brought under Kansas law. Even assuming Talavera can rely on such a theory, the terms of Dr. Wiley's contract do not give rise to any duty under which he could incur liability under the facts of this case.

In support of her theory for duty, Talavera relies on a portion of Dr. Wiley's contract entitled "Physician's Obligations," which states in pertinent part:

<u>Availability</u>

A. While on duty remain on the grounds of the Hospital and keep the Emergency Department staff advised of his whereabouts at all times.

B. While on duty respond within 20 minutes of notification by the Emergency Department staff of the arrival of a patient.

C. While on duty shall carry a pager on his person at all times.

App. 626.

This provision does not give rise to a duty in tort for Dr. Wiley "to see, examine and treat" a patient within twenty minutes of being notified of his or her arrival in the hospital. Rather, the provision only requires a "respon[se]" from Dr. Wiley within 20 minutes. It does not condition that time frame in any way that would create a physician-patient relationship with every emergency room patient within 20 minutes of a physician being notified of a patient's arrival in the hospital. Thus, Talavera has failed to demonstrate Dr. Wiley owed her a duty as his patient at the time when tPA was a viable treatment option.[5]

### b. Eligibility for tPA

Even if Dr. Wiley had a duty to diagnose Talavera, we agree with the district court that she has not established material facts that would support her

---

[5] Because the district court declined to reach any conclusions on the duty question, Talavera also suggests that we cannot rely on this alternative theory in support of the judgment below. She is incorrect. *See, e.g.*, *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1037 n.7 (10th Cir. 2011) ("Under our case law, an appellee is generally permitted to defend the judgment won below on any ground supported by the record without filing a cross appeal." (citations and internal quotation marks omitted)).

Talavera also suggests that testimony from Dr. Joseph Yates, an ER physician, demonstrates Dr. Wiley had a duty to Talavera during her *first* hospital visit. We disagree. In the referenced report (which was discussed in related deposition testimony), Dr. Yates argues: "[t]he physician on duty in an emergency department and the hospital have the obligation, in order to meet the standard of care, to make every patient aware of the risk he or she takes by refusing care before they allow the patient to make an informed decision to refuse care." App. 651; *see also* App. 649 (deposition testimony). Talavera does not explain how Dr. Yates would be qualified to offer this legal conclusion, and in any case we find no authority in Kansas law for imposing such a broad requirement upon "on duty" physicians.

eligibility for tPA.  As relevant here, at least two circumstances exist under which a patient who otherwise would qualify for tPA would not be eligible for the treatment.  These circumstances are referred to as exclusion criteria for tPA.  The first exclusion criterion is triggered if a CT scan reveals a large infarct or any hemorrhaging in the brain.  The second exclusion criterion is triggered if there is evidence of head trauma or bruising on the head.  The presence of either criterion by itself would preclude tPA treatment.  A central disagreement between the parties is whether either of these exclusion criteria applied in this case.

We agree with the district court and defendants that this disagreement is settled by Talavera's expert, Dr. Helgason.  In response to questions regarding whether the tPA exclusion criteria might apply, Dr. Helgason conceded she could not "say within a reasonable degree of medical probability that [Talavera] would have qualified to receive tPA in that first [hospital visit]—prior to 1:30 a.m." App. 1191.  On the basis of this concession, the district court granted summary judgement to Dr. Wiley on the tPA claim, holding that Talavera had not shown, to a reasonable degree of medical certainty, that she would have benefitted from this treatment.

Kansas law requires expert testimony that Dr. Wiley's acts or omissions deprived Talavera of the benefit of tPA, thereby causing her injuries.  Based on her expert's testimony, Talavera cannot point to expert medical evidence establishing that she would have benefitted from tPA.

-18-

Talavera suggests three reasons why Dr. Helgason's concession does not resolve the causation matter. We find none of these arguments persuasive. *First*, Talavera emphasizes that, notwithstanding Dr. Helgason's later qualifications at her deposition, Dr. Helgason's expert report states that timely tPA therapy during Talavera's first visit to the hospital would have yielded a better clinical outcome. We reject this argument for the reasons stated above: we cannot look at Dr. Helgason's expert report in isolation but must review it in light of her later, more qualified, testimony.

*Second*, Talavera argues that notwithstanding Dr. Helgason's concession, the doctor would have testified if asked that the tPA exclusion criterion did not apply. But Dr. Helgason's response was clear and unequivocal and we have no basis to speculate on how she would have responded to questions not asked.

Further, even viewing the evidence in the light most favorable to Talavera, she cannot establish that Dr. Helgason would have ruled out the CT exclusion criterion if she had been asked about it directly during her deposition. Rather, Dr. Helgason testified that in order to qualify for tPA, the damage in a potential tPA patient's middle cerebral artery territory (where Talavera's infarct began) should be "less than a third of the territory." App. 1190. With reference to the CT scan at issue here, Dr. Helgason suggested:

> If [Talavera] turned out to be a candidate [for tPA], in other words, *if there wasn't the finding on CT that ultimately was found I believe the next day, which*

> *actually looks like it was one-third of the middle
> cerebral artery territory*, that she would have been a
> candidate for tPA.

*Id.* at 1134-35 (emphasis added). Thus, in Dr. Helgason's opinion, if Dr. Wiley

had ordered a CT scan during Talavera's first visit to the SWMC and if that scan

had revealed an infarct of the same size as the one present in the scan performed

at 4 a.m. (i.e., a scan revealing an infarct the size of one third of the middle

cerebral artery territory), then Talavera still would have been precluded from

receiving tPA.

Talavera has provided no basis to conclude that there would have been a

material difference in the size of the infarct before 1:30 a.m and the size at 4 a.m.

For example, she provides no evidence about the typical growth patterns of

Talavera's type of infarct or factors that might increase or decrease the rate of its

growth and effect on brain function. Thus, even if Dr. Helgason's concession

itself were not enough, on the record Talavera has provided, she cannot

demonstrate that Dr. Helgason could have ruled out the presence of the CT scan

exclusion criterion.[6]

_____

[6] Dr. Helgason also stated she would be "hesitant to give tPA" if there was "definite documentation of head trauma" or "bruising on the head." App. 1146. And Dr. Helgason noted that a report of "falling and bumping your head" would "contraindicate[]" tPA as a viable treatment option. *Id.* Arguing that Dr. Helgason could have testified that this criterion also would apply, the defendants point to a report filled out by a nurse at the beginning of Talavera's third hospital visit, which notes Talavera had "multiple bruis[es]" on her leg and chin. *Id.* at 575. Further, although it is not noted by either party, Talavera's sister stated in

(continued...)

*Third*, Talavera suggests the full record, including the testimony of other medical experts, shows neither exclusion criterion could apply. This argument fails for lack of support in the record: even assuming Talavera can meet her burden by relying on other witnesses' testimony to disprove the presence of the exclusion criteria, no other expert actually offered testimony ruling out the CT exclusion criterion.

On this issue, Talavera suggests "the medical records and the testimony of the radiologists[] are all in agreement that the CT scan taken . . . *did not show* a large infarct or hemorrhage" that would preclude tPA treatment. Aplt. Br. at 12 (internal quotations and citation to the record omitted). In support of this proposition, Talavera relies on the testimony of the two radiologists who were deposed in this case: Dr. Zainali, the radiologist who initially reviewed Talavera's CT scan, and Dr. Pablo Delgado, Talavera's own expert radiologist.

---

[6](...continued)
her deposition that when she saw Talavera just after Talavera was found unconscious in the Walmart bathroom, "you could see a bump on [Talavera's] head." App. 599. For two reasons, we do not think this evidence alone would establish that the head trauma exclusion criterion would apply, at least on the deferential view of the evidence that Talavera enjoys at summary judgment. First, similar forms filled out by hospital staff during Talavera's first and second visits make no note of bruising or abrasions, and at summary judgment we would need to resolve this inconsistency in Talavera's favor. Second, it is unclear from Dr. Helgason's testimony if this amount of head trauma definitively precludes tPA: rather, Dr. Helgason testified such trauma would contraindicate or create hesitancy about using tPA.

Talavera contends both experts saw no evidence of hemorrhaging in the CT scan taken at 4 a.m., and that both radiologists found an infarct that was not prohibitively large for tPA. But neither expert's testimony actually supports her argument. First, although Talavera correctly notes that Dr. Zainali did not describe the infarct as large and implied that he could barely see it when he reviewed the CT scan, Dr. Zainali did not provide any sort of conclusion as to whether the infarct was small enough to allow for the use of tPA therapy, nor is it clear that he would have been qualified to do so.

Second, as to Dr. Delgado, he described the infarct as "moderate to large," noting that such a practice was common for radiologists who often "hedge between the two [sizes] and say moderate to large meaning it certainly is not tiny or small and it is certainly not massive at this point in time." App. 1812. In her briefing, Talavera only references the portion of the above testimony in which Dr. Delgado says the infarct "is not tiny or small and it is certainly not massive at this point in time." Aplt. Br. at 23. But this selective quoting obscures the fact that Talavera's own expert radiologist would describe the infarct as large. Moreover, there is no evidence in the record that Dr. Delgado would describe the infarct as small enough to allow for tPA or, again, whether he would even be qualified to make such a determination. Thus, neither of these two doctors provide an alternative font of evidence that tPA was a viable treatment.

-22-

In sum, then, we find no error in the district court's determination that Talavera failed to prove causation as to her claim that she was entitled to receive tPA.

### 2. *Hemicraniectomy Claim*

Talavera's second theory of liability is that if the defendants had diagnosed her stroke earlier, she would have received a hemicraniectomy sooner and yielded a better clinical outcome. A hemicraniectomy is the procedure Dr. Moufarrij eventually performed to reduce the potential harm caused by swelling to Talavera's brain.

We agree with the district court that no fact question exists on this claim. First, although Dr. Helgason testified in her deposition that while Talavera was a *candidate* for an earlier hemicraniectomy, Dr. Helgason said she would defer to the expertise of a neurosurgeon as to the timing of the procedure. And the only neurosurgeon to offer an opinion on the timing of the hemicraniectomy was Dr. Moufarrij, the surgeon who performed the procedure on Talavera. He concluded that an earlier procedure would not have changed the outcome. According to Dr. Moufarrij:

> It is my opinion that the [hemicraniectomy] that I performed was done preventively. Performing [this procedure] any earlier would not have changed the outcome for this patient. The [hemicraniectomy] was done at day 7 from the outset of her ischemic symptoms which is the period during which the cerebral edema is expected to increase critically.

Any earlier treatment would not have resulted in any earlier surgical intervention by me or any other neurosurgeon under the standard of care.

App. 990. Because the only neurosurgeon to offer an opinion as to the timing of the hemicraniectomy stated it would not have mattered for Talavera, she cannot prevail on a negligence theory relying on earlier intervention.

Talavera advances a number of arguments against this conclusion, none of which we find persuasive. First, she points to various parts of Dr. Helgason's deposition testimony and her expert report, where Dr. Helgason suggests that Talavera would definitely have been a candidate for an earlier hemicraniectomy. But as we discussed above, Dr. Helgason later conceded that only a neurosurgeon was qualified to make this assessment. Thus, nothing in the record shows causation on this claim to a reasonable degree of medical certainty.

Talavera also claims two cases, *Wilson v. Knight*, 982 P.2d 400 (Kan. 1999), and *Esquivel v. Watters*, 183 P.3d 847 (Kan. 2008), establish that Dr. Helgason's testimony as to causation is sufficient to survive a motion for summary judgment. But both of these cases are readily distinguishable because the experts whose testimony was questioned never actually deferred to another authority about the feasibility or timing of a procedure that would have benefitted the plaintiff in question.

Finally, Talavera suggests we should disregard Dr. Moufarrij's affidavit because it lacks "the attestation that his statements or opinions are given to a

-24-

reasonable degree of medical certainty." Rep. Br. at 22. But Talavera failed to raise this evidentiary objection below and points to no authority in support of her position that an expert must invoke the phrase "reasonable degree of medical certainty" or some other shibboleth to allow a court to consider the expert opinion. In short, none of Talavera's arguments convince us to disturb the judgment of the district court as to this claim.

### 3. *Loss of Chance*

Talavera's final argument is that the defendants' negligence cost her the chance of a better recovery, a theory of liability established by the Kansas Supreme Court in *Delaney v. Cade*, 873 P.2d 175 (Kan. 1994); s*ee also* Joseph H. King, *Causation, Valuation, and Chance in Personal Injury Torts Involving Preexisting Conditions and Future Consequences*, 90 Yale L.J. 1353 (1981) (relied upon by the *Delaney* court in adopting this theory of liability).

In essence, loss-of-chance theory is designed to address the problem created by the all-or-nothing rule of "but for" causation. For a classic example of how this problem could arise, consider a surgery in which the plaintiff has a forty percent chance of survival but dies because of his surgeon's negligence. Under the traditional all-or-nothing rule of causation, the plaintiff's estate could not establish that "but for" the surgeon's negligence, it was more likely than not that the plaintiff would have survived, given that the plaintiff had less than a fifty percent chance of survival.

Under the loss-of-chance theory, however, the plaintiff's estate could bring an action for the lost forty-percent chance of survival created by the negligence. Upon a showing that the negligence caused the lost chance, damages are calculated as a function of the full value of the harm caused (i.e., the damages incurred from the loss of life, such as loss of consortium and lost earnings potential) multiplied by the percentage of the loss incurred (in this case, forty percent).

While the Kansas Supreme Court adopted loss-of-chance theory as a form of actionable tort liability in Kansas, it placed two limitations on its use. First, the court adopted what it referred to as "the relaxed" rule on causation as applied to such claims. Under this rule, a defendant must show a "substantial" loss of chance but specifically declined to "attempt to draw a bright line rule on the percentage of lost chance that would be sufficient for the case to be submitted to the jury." *Delaney*, 873 P.2d at 185–86.

Second, the Kansas court also required plaintiffs to use a "proportional damage approach." In suggesting how to apply the proportional damage approach, the *Delaney* court relied on a federal district court opinion, *Boody v. United States*, 706 F. Supp. 1458 (D. Kan. 1989). In that case, the court reasoned that:

> [T]he percentage method gives juries and judges
> concrete guidelines on how to measure damages,
> alleviating the 'pulling out of the hat' problem identified

-26-

> with [a different method]. If the decision maker
> believes plaintiff's expert(s) on causation, the
> percentage of chance lost, then it makes the usual
> finding on the value of a life ($X) and multiplies $X by
> the percentage of chance lost to arrive at the
> compensation for the lost chance to survive.

*Delaney*, 873 P.2d at 187 (quoting *Boody*, 706 F. Supp. at 1465–66).

Relying on this rationale from *Boody*, *Delaney* required expert medical testimony to calculate the percentage of damages recoverable:

> [Under this method] the amount recoverable equals the
> total sum of damages ordinarily recovered for the
> underlying injury or death multiplied by the percent of
> lost chance. *Because this method requires expert*
> *medical testimony in ascertaining the appropriate*
> *(percent) amount of damages recoverable*, courts
> employing this method eliminate the risks of
> compensating the plaintiff for anything other than the
> value of the lost chance.

873 P.2d at 187 (emphasis added).

Interpreting this language from *Delaney*, the district court dismissed Talavera's loss-of-chance claim because Talavera had failed to provide the court with lost chance described in the appropriate percentage amount of damages recoverable. Talavera does not dispute she did not state her loss of chance of recovery claim in such terms. She nevertheless urges Kansas law cannot be read to impose such a requirement.

Talavera's position is unpersuasive. She fails to address the language from *Delaney* that states the Kansas approach to loss of chance "*requires* expert

medical testimony in ascertaining the appropriate (percent) amount of damages recoverable." 873 P.2d at 187 (emphasis added). Rather than addressing this language, Talavera raises an issue not in debate: whether she has satisfied the standard for showing a "substantial" loss of chance. Further, Talavera points to no case—and we find none—in which a court has allowed a loss-of-chance theory to proceed without an finding of a specific percentage of chance lost.[7] In fact, in the one case Talavera does rely on as supportive of her position, *Pipe v. Hamilton*, 56 P.3d 823 (Kan. 2002), an expert did provide testimony establishing the percentage loss of chance to be attributed to a defendant's negligence, *see id.* at 828 (noting that an expert had established that the plaintiff had a ten percent

[7] The requirement of establishing an approximate percentage of chance lost is also in keeping with recent case law on loss of chance, including one unpublished opinion from the Kansas Court of Appeals. *See Finney v. City of Wellington*, 227 P.3d 1010 (Kan. Ct. App. 2010) (unpublished) ("The loss of chance of survival must be expressed as a percentage to guide the calculation of damages. As a result, [the expert's] conclusion was insufficient not only on causation but also for failure to establish a percentage of the loss of chance of survival." (citing *Delaney*)); *Matsuyama v. Birnbaum*, 890 N.E.2d 819, 841 (Mass. 2008) ("Expert testimony is required to ascertain what measure of a more favorable outcome is medically appropriate (for example, five-year survival as in this case), to determine what statistical rates of survival apply in what circumstances, for example, a 37.5% chance of survival, and to apply these rates to the particular clinical circumstances of the patient.")). *But cf. Recent Cases: Tort Law—Loss of Doctrine—Massachusetts Supreme Judicial Court Accepts Loss of A Chance in Medical Malpractice Suits—Matsuyama v. Birnbaum, 890 N.E.2d 819 (Mass. 2008)*, 122 Harv. L. Rev. 1247, 1253 (2009) (criticizing *Matsuyama*'s holding and noting that "treating evidence as key does not a priori bar certain kinds of claims, but rather invites clever plaintiff's lawyers to find experts capable of generating the requisite statistics").

chance of survival).  Thus, because Talavera has failed to provide expert testimony expressing her loss of chance in terms of a percentage, this claim fails.

## III.  Conclusion

Accordingly, for the reasons stated above, we AFFIRM the judgment of the district court.