No. 124,357

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

RAYMOND L. MILLER, as Guardian and Conservator of
REGINA KAY MILLER,
*Appellant*,

v.

HUTCHINSON REGIONAL MEDICAL CENTER,
*Defendant*,

and

ESTATE OF JAMES A. ISAAC, M.D.,
By and Through its Special Administrator,
GREGORY JAMES ISAAC,
*Appellee*.


SYLLABUS BY THE COURT


1.

Under Kansas law, a patient bringing a medical malpractice action against a physician must prove: (1) the physician owed the patient a duty of care; (2) the physician's actions in caring for the patient fell below professionally recognized standards; (3) the patient suffered injury or harm; and (4) the injury or harm was proximately caused by the physician's deviation from the standard of care.


2.

Without a legally recognized physician-patient relationship, there is no duty of care for purposes of establishing medical negligence.


1

3.

In a medical negligence action, the existence of a physician-patient relationship typically presents a question of fact for the jury to answer.

4.

If a plaintiff is given the benefit of every dispute in the relevant evidence, the district court may grant summary judgment for the defendant in a medical negligence action so long as no reasonable jury could conclude a physician-patient relationship had been established.

5.

On the particular facts presented, the district court erred in finding no physician-patient relationship existed and granting summary judgment on that basis.

Appeal from Sedgwick District Court; DEBORAH HERNANDEZ MITCHELL, judge. Opinion filed January 20, 2023. Reversed and remanded with directions.

*J. Darin Hayes* and *Kaylea D. Knappenberger*, of Hutton & Hutton Law firm, LLC, of Wichita, for appellant.

*Brian L. White* and *Mark R. Maloney*, of Hinkle Law Firm LLC, of Wichita, for appellees.

Before ARNOLD-BURGER, CJ, ATCHESON, and WARNER, JJ.

ATCHESON, J.: This appeal turns on whether a neurologist formed a doctor-patient relationship with a woman who sought treatment at the Hutchinson Regional Medical Center when an emergency room physician there called him to consult on a tentative diagnosis and the need for further diagnostic testing. Dr. James A. Isaac, the neurologist, had agreed to serve as an on-call consultant to maintain admitting privileges at the medical center. This narrow issue has come up in a medical malpractice action brought

on behalf of Regina Kay Miller, the woman, against the medical center and the two physicians on the grounds they misdiagnosed her and, as a result, she suffered a debilitating stroke.

The Sedgwick County District Court found no doctor-patient relationship existed and for that reason granted summary judgment to Dr. Isaac's estate, which has been substituted as the named defendant because the doctor died during this litigation. Without such a relationship, there is no duty of care, and there can be no medical negligence absent a legally recognized duty. Miller, acting through her husband as the nominal plaintiff, has appealed the ruling.

A trilogy of Kansas Supreme Court cases sets out legal principles governing when a consulting physician enters into a doctor-patient relationship. But the standards are ragged and outline something short of a conclusive test. We must consider the summary judgment evidence in the best light for Miller. Given the evidence and the governing law, we conclude the district court erred in entering summary judgment—reasonable jurors might find a doctor-patient relationship between Dr. Isaac and Miller. We, therefore, reverse the judgment and remand to the district court for further proceedings.

FACTUAL AND PROCEDURAL BACKGROUND

Because the appeal challenges a summary judgment, the standards of review in both the district court and here dictate how we look at the relevant facts. So we set out the standards before reciting the governing facts. See *Bouton v. Byers*, 50 Kan. App. 2d 34, 36-37, 321 P.3d 780 (2014). The standard, of course, has been often stated and is, therefore, well known.

When considering summary judgment, the district court must view the evidence properly submitted in support of and in opposition to the motion most favorably to the

party opposing the motion and give that party the benefit of every reasonable inference that might be drawn from that record. *Trear v. Chamberlain*, 308 Kan. 932, 935-36, 425 P.3d 297 (2018); *Shamberg, Johnson & Bergman, Chtd. v. Oliver*, 289 Kan. 891, 900, 220 P.3d 333 (2009). The party seeking summary judgment has to show that even taking the evidence in that light, there are no genuine disputes over any material facts and it is entitled to judgment as a matter of law. *Trear*, 308 Kan. at 935; *Shamberg, Johnson & Bergman, Chtd.*, 289 Kan. 900. Basically, the moving party submits no reasonable construction of the evidence would permit a jury to return a verdict for the opposing party.

An appellate court applies the same standards in reviewing a challenge to the district court's entry of summary judgment. We, therefore, owe no particular deference to the district court's ruling, since it effectively applies a set of undisputed facts viewed favorably to the plaintiff to the controlling legal principles. Summary judgment, then, presents a question of law an appellate court can assess just as well as the district court. See *Adams v. Board of Sedgwick County Comm'rs*, 289 Kan. 577, 584, 214 P.3d 1173 (2009). Given those principles, we render an account of the facts favoring the plaintiff, recognizing some of the key circumstances actually are disputed.

About 10 p.m. on a weekday evening in late January 2018, Raymond L. Miller took his wife Regina to the emergency room at the Hutchinson Regional Medical Center. They saw Dr. Li Jia, an emergency room physician, and reported that Regina had stroke-like symptoms for about a minute earlier in the evening. (We refer to Regina as Miller in the remainder of this opinion and refer to Raymond by his first name.) Miller was in her early 40s and apparently had a history of migraines. Dr. Jia concluded Miller likely had a "complex migraine" that can have symptoms mimicking a stroke. He recommended against a CT scan that would help differentiate between a migraine and a stroke as the cause of what Miller experienced.

4

That evening Dr. Isaac was on call for emergency room physicians at the medical center. Under the arrangement with the medical center, Dr. Isaac and his medical partner, another neurologist, each agreed to be available to consult with the emergency room physicians 10 days a month. Providing on-call consultations was a condition for the two neurologists being allowed to admit patients to the medical center. The agreement was unwritten and could be characterized as a general understanding without much detail.

In a deposition, Dr. Jia testified he called Dr. Isaac around 11 p.m. to secure his opinion about Miller's condition. The telephone call lasted several minutes, although the precise duration is uncertain. According to Dr. Jia, he described Miller's clinical history and symptoms to Dr. Isaac, outlined his diagnosis of complex migraine, and offered his assessment that discharging Miller would be appropriate. Again, according to Dr. Jia, Dr. Isaac agreed with the diagnosis and assessment, and the hospital record suggests Dr. Isaac concluded there was no need for a CT scan.

The Millers twice asked Dr. Jia to contact the on-call neurologist. Dr. Jia, however, also testified that he felt he needed to consult with Dr. Isaac about the diagnosis before releasing Miller and to make sure Dr. Isaac would be available to see her the next day. Dr. Isaac neither reviewed any clinical records nor spoke directly to either of the Millers. He had not previously seen Miller as a patient.

In his deposition, Dr. Isaac offered a substantially different account of the telephone call: Dr. Jia called simply to determine if he would see Miller as a patient the next day, so he offered no medical opinion or advice. Consistent with the standards governing summary judgment, both we and the district court have properly declined to consider Dr. Isaac's testimony about the call with Dr. Jia. Resolving the obvious inconsistency in those versions of the same event is a task entrusted to a jury or a district court judge acting as the fact-finder during a trial. (Although Dr. Isaac's estate is now the

5

named party, we refer to Dr. Isaac in the balance of the opinion as if he were still the defendant.)

After speaking with Dr. Isaac, Dr. Jia discharged Miller without ordering a CT scan or other further testing and without treating her for a stroke. After returning home with Raymond, Miller suffered a stroke leaving her with sufficiently severe and permanent disabilities she can no longer manage her personal affairs. Raymond has been appointed Miller's guardian and custodian. In that capacity, Raymond filed this action on behalf of Miller against Dr. Jia, Dr. Isaac, and the Hutchinson Regional Medical Center. To oversimplify an aspect of the case not directly relevant to this appeal, the theory of liability is that Dr. Jia and Dr. Isaac deviated from appropriate medical standards by not having Miller undergo a computed tomography angiography—a CT scan with a contrast medium—that would have indicated the physical condition that caused the severe stroke the next morning, prompting immediate treatment that would have averted the stroke.

We mention several markers in the procedural progression of the case. First, the parties do not dispute venue properly lies in Sedgwick County. Second, Dr. Jia has settled the claim against him, and he is no longer a defendant in the case. After granting summary judgment to Dr. Isaac, the district court directed that the ruling be treated as a final judgment under K.S.A. 2020 Supp. 60-254(b), permitting an immediate appeal. The parties have not questioned the ruling, so we decline to do so on our own. See *Ball v. Credit Bureau Services, Inc.*, No. 111,144, 2015 WL 4366440, at *13-14 (Kan. App. 2015) (unpublished opinion). The claims against Hutchinson Regional Medical Center remain unresolved in the district court.

Raymond Miller, as the formal plaintiff, has appealed the district court's decision granting summary judgment to Dr. Isaac's estate. That is the sole issue before us.

LEGAL ANALYSIS

We have already set out the summary judgment standards applicable in the district court and for appellate review.

Under Kansas law, a patient bringing a medical malpractice action against a physician must prove: (1) the physician owed the patient a duty of care; (2) the physician's actions in caring for the patient fell below professionally recognized standards; (3) the patient suffered injury or harm; and (4) the injury or harm was proximately caused by the physician's deviation from the standard of care. *Burnette v. Eubanks*, 308 Kan. 838, 842, 425 P.3d 343 (2018); *Russell v. May*, 306 Kan. 1058, 1067-68, 400 P.3d 647 (2017). Those elements, however, essentially presuppose the existence of a legally recognized physician-patient relationship. And without that relationship, there is no duty of care. *Russell*, 306 Kan. at 1069 ("[A] legal duty arises with the formation of a physician-patient relationship."); *Irvin v. Smith*, 272 Kan. 112, 122, 31 P.3d 934 (2001) ("Absent the existence of a physician-patient relationship, there can be no liability for medical malpractice.").

The Kansas Supreme Court has characterized the existence of a doctor-patient relationship as a question of fact typically reserved for the jury to answer. *Russell*, 306 Kan. 1058, Syl. ¶ 5; *Irvin*, 272 Kan. at 119. Nonetheless, if a plaintiff is given the benefit of every dispute in the relevant evidence, the district court may grant summary judgment for the defendant so long as no reasonable jury could conclude a doctor-patient relationship had been established. See *Russell*, 306 Kan. at 1069; cf. *Estate of Belden v. Brown County*, 46 Kan. App. 2d 247, 276, 261 P.3d 943 (2011) ("Should the evidence taken in the best light for a plaintiff nonetheless fail to establish a basis for a jury to return a verdict for that plaintiff, the court may enter a summary judgment for the defendant" on what would be a question of fact.). In granting Dr. Isaac's motion, the district court mistakenly construed the summary judgment record as legally and factually

7

incompatible with any reasonable determination that Miller may have had a doctor-patient relationship with Dr. Isaac.

To reiterate, the only issue before us is whether Miller has presented evidence from which a jury might reasonably conclude she formed a physician-patient relationship with Dr. Isaac. As we have indicated, three Kansas Supreme Court cases address the formation of the relationship. Dr. Isaac, not surprisingly, zeroes in on *Irvin*. In that case, the court held that a physician engaging in what it characterized as an "informal" or "curbside" consultation with a colleague does not form a physician-patient relationship with the colleague's patient. In turn, the patient could not sue the consulted physician for medical malpractice, since there would be no relationship between them giving rise to an actionable legal duty. 272 Kan. at 121-23.

In *Irvin*, a child living in western Kansas had a shunt or tube that drained excess fluid that chronically accumulated around her brain. When the child began having seizures and other symptoms possibly indicating a shunt malfunction, her local doctor had her transferred to a Wichita hospital, where a pediatric specialist admitted her as a patient. The admitting physician called a highly respected pediatric neurologist in Wichita the same day for a consultation. The physician chose to contact the neurologist because of his reputation. The neurologist was "'not on call'" at the hospital and had "no contractual obligation . . . requir[ing] him to attend any patients at [the hospital]." 272 Kan. at 122.

The admitting physician and the neurologist had a lengthy telephone conference and decided they should perform a mildly invasive diagnostic test the next day to evaluate the shunt's capacity. The child appeared to be in no immediate danger. The neurologist had not seen the child, offered no diagnosis for the cause of the seizures, and suggested no treatment plan. The next morning, before the test could be done, the child's condition rapidly deteriorated, and she suffered severe brain damage apparently because

8

the shunt failed. The child's parents filed a medical malpractice action against a host of defendants including the neurologist. Pertinent here, the district court granted summary judgment to the neurologist, finding he had no physician-patient relationship with the child.

In reviewing the summary judgment ruling, the *Irvin* court noted the dearth of Kansas decisions exploring when a consulting physician may enter into a doctor-patient relationship creating an actionable legal duty. The court affirmed the judgment for the neurologist and drew a distinction between informal or "curbside" consultations, on the one hand, and "formal" consultations, on the other. The court found the neurologist provided only an informal consultation and, as a matter of public policy, those sorts of discussions should be insulated from legal liability in medical malpractice actions. 272 Kan. at 123. Two dissenting justices doubted the majority's division of informal and formal consultations as a policy matter and would have found a jury question on the facts as to the existence of a doctor-patient relationship. 272 Kan. at 135, 139 (Lockett, J., joined by Allegrucci, J., dissenting).

The *Irvin* court mostly sets out what it considers hallmarks of formal consultations that establish physician-patient relationships and a concomitant duty of care. So, "generally" the physician has to "personally examine" the patient. 272 Kan. at 120. But that is not essential; "indirect contact" may be sufficient in some circumstances. 272 Kan. at 120. A physician must expressly or impliedly agree to advise or treat the patient. The patient, then, customarily seeks out the physician. 272 Kan. at 121. Yet, "an implied physician-patient relationship may be found where the physician gives advice to a patient by communicating the advice through another health care professional." 272 Kan. at 120. The court described a "formal consultation" as entailing "a full bedside review" with a "physical examination" of the patient and a review of clinical records. 272 Kan. at 123. A doctor-patient relationship—and potential liability for malpractice—exists when the doctor "assumes the role of treating the patient." 272 Kan. at 120.

9

But the court did not attempt to forge those observations into a set of factors or a predictive legal test. They seem ill-suited to defining some overarching principle, and they poorly fit certain medical specialties—most obviously, perhaps, radiology and pathology in which the practitioners have little or no direct contact with the patient. The *Irvin* dissenters noted as much in passing. 272 Kan. at 136 (citing and quoting *Bovara v. St. Francis Hospital,* 298 Ill. App. 3d 1025, 1030-31, 700 N.E.2d 143 [1998]). Ultimately, the court affirmed the summary judgment because of how the neurologist was drawn into the consultation and the limited role he took ahead of the patient's precipitous decline.

Although *Irvin* remains the leading Kansas appellate decision on when a consulting physician may enter a doctor-patient relationship, it is bookended by two other cases that looked at the formation of the relationship. *Russell*, 306 Kan. 1058; *Adams v. Via Christi Regional Medical Center*, 270 Kan. 824, 19 P.3d 132 (2001). We discuss them briefly as generally informing the issue.

In *Adams*, a family physician cross-appealed a jury determination he had a doctor-patient relationship with a young woman who died from complications of an ectopic pregnancy. The doctor was the family physician for the 22-year-old woman's parents and her siblings but had not seen the woman as a patient for about four years. The woman's mother called the doctor's service at about 9 p.m. and received an immediate return call from the doctor. She reported that her daughter was 5 to 8 weeks pregnant and was experiencing significant abdominal pain. The doctor, who had discontinued his obstetrical practice, advised mother that abdominal pain was not unusual with pregnancy and to take her daughter to the emergency room if she got worse and to have her see a physician the next day. About three hours later, mother took the woman to the hospital. The woman had a ruptured ectopic pregnancy that led to cardiac arrest and, in turn, to brain death. The doctor later testified that he knew ectopic pregnancies pose serious risks beginning at about 8 weeks, but he did not consider that possibility during the telephone

call with the woman's mother. A jury later found the hospital and the doctor liable in a medical malpractice action. In an appeal, the doctor argued he did not have a physician-patient relationship with the woman and, therefore, did not have any legal liability.

The court rejected the doctor's argument and found sufficient evidence to support the jury's conclusion there was a physician-patient relationship with the woman principally because the doctor took "some action to give medical assistance" rather than deflecting mother's inquiry by saying he no longer provided obstetrical care or simply referring her to another practitioner. *Adams*, 270 Kan. at 836-37. The court also recognized that if the professional relationship between the doctor and the woman had lapsed, the substantive medical advice transmitted during the telephone call with mother "renewed" the relationship. 270 Kan. at 837. The doctor functionally treated the woman by "express[ing] his medical opinion about her condition" and suggesting she "was experiencing nothing unusual" in what turned out to be a life-threatening emergency. 270 Kan. at 837. And that was true even though the doctor did not see or speak to the woman and provided his medical assessment to a proxy.

In *Russell*, the Kansas Supreme Court returned to the issue of when a doctor-patient relationship exists, although the relevant point there turned on whether the relationship had ended. 306 Kan. at 1070-71. In getting to that question, the court relied on *Adams* for the proposition that "'the physician's express or implied consent to advise or treat the patient is required for the relationship to come in to being.'" 306 Kan. at 1069 (quoting *Adams*, 270 Kan. at 835). The *Adams* court immediately went on to say that consent would be inferred when a physician "take[s] some affirmative action with regard to treatment of a patient." 270 Kan. at 835. The facts in *Russell* don't shed much light on formation of the professional relationship for our purposes. There, a woman saw a primary care physician who took a history, examined her, and made a referral to a specialist for sophisticated diagnostic testing. The specialist then reviewed the test results and met with the woman. The woman later saw a gynecologist for a routine checkup. The

11

physicians failed to diagnose the woman's breast cancer, and she sued all three for medical malpractice. The court reversed the district court's ruling granting judgment as a matter of law to the primary care physician the woman first saw because there was sufficient evidence of a continuing duty of care (and, hence, a doctor-patient relationship) to send the claim to the jury. 306 Kan. at 1070-71. The court also found sufficient evidence on the other elements of the malpractice claim against the primary care physician, determinations that are legally beside the point for our purposes.[1]

[1] Although this court's decision in *Seeber v. Ebeling*, 36 Kan. App. 2d 501, 141 P.3d 1180 (2006), involved a medical malpractice action against an on-call physician, it is wholly uninformative given the facts. Seeber arrived at a Topeka hospital after suffering serious injuries in a motor vehicle mishap. An emergency room physician contacted Ebeling as the hospital's designated on-call neurosurgeon. After listening to the ER physician's recitation of Seeber's condition, Ebeling refused to come to the hospital to examine Seeber and offered no medical opinion about possible treatment. Ebeling told the ER physician to contact an orthopedic surgeon affiliated with the hospital or to transfer Seeber to another hospital. Seeber was eventually transferred. We affirmed the district court's grant of summary judgment to Ebeling on the grounds he never established a doctor-patient relationship with Seeber, since he refused to provide any medical opinion on the injuries or a course of care. In turn, Ebeling could not be liable for medical malpractice absent such a relationship. 36 Kan. App. 2d at 518. In discussing the formation of doctor-patient relationships in Kansas, *Seeber* drew briefly from *Irvin* and *Adams* without much elaboration. 36 Kan. App. 2d at 514-15.

As we have indicated, the Kansas appellate caselaw does not yield an especially clear or harmonious structure for our task here. We can say the *Irvin* court treated the pediatric neurologist as an "informal or curbside" consultant—a role that does not create a doctor-patient relationship imposing a duty of care. The court, however, did not lay out indicia of curbside consultations. Moreover, consistent with *Adams*, the neurologist in *Irvin* withheld any assessment of the patient's condition and any recommendation for treatment—deferring a professional opinion until the planned diagnostic test had been completed. So for that reason, as well, there may have been no doctor-patient relationship.

Likewise, so-called "curbside consultations" do not seem to have particularly well-formed contours within the medical profession or in legal proceedings. Indeed, these collaborations are known by different names among physicians: back door, hallway, lunchroom, or coffee room consultations. Perley, *Physician use of the curbside consultation to address information needs: report on a collective case study*, 94 J. Med. Libr. Assoc. No. 2, 137, 138 (April 2006). As the terms suggest, the interactions tend to "take place opportunistically," and the consulted physician is not compensated. The consulted physician typically relies on information conveyed by the consulting physician. And the consulting physician generally does not tell the patient about the consultation. See Zacharias et al., *Curbside Consults in Clinical Medicine: Empirical and Liability Challenges*, 49 J. L. Med. & Ethics 599, 599 (2021); Suri, *Action, Affiliation, and a Duty of Care: Physicians' Liability in Nontraditional Settings*, 89 Fordham L. Rev. 301, 315-16 (2020); *Curbside Consultations*, 7 Psychiatry (Edgmont) No. 5, 51-52 (May 2010); 94 J. Med. Libr. Assoc. No. 2, at 138; Berlin, *Malpractice Issues in Radiology: Curbstone Consultations*, 178 Am. J. Roentgenology 1353, 1354 (June 2002). A survey of medical practitioners indicated there were no settled rules for participating in curbside consultations, although their use was an expected and commonplace part of the profession. 94 J. Med. Libr. Assoc. No. 2, at 141.

A recent examination of the law across jurisdictions on curbside consultations, on-call physicians, and the imposition of malpractice liability suggests myriad lines of judicial analyses, often coupled with fact-intensive inquiries, leading to varied outcomes. 89 Fordham L. Rev. at 304 (recognizing "divergent approaches courts use" in cases involving curbside consultants and on-call physicians); see also Zuckett and Ryckman, *No Physician-Patient Relationship Means No Duty, Right? Warning: Get a Second Opinion*, 56 DRI For the Defense No. 8, 12 (August 2014) (noting varied and changing judicial views on establishment of physician-patient relationships). This division is nothing new, as the authority compiled in *Kelley v. Middle Tennessee Emergency Physicians, P.C.*, 133 S.W.3d 587, 593-96 (Tenn. 2004), and the dueling citations in the

*Irvin* majority opinion and dissent illustrate. Succinctly, the law around the country is a hodgepodge.

But with the expanded use of on-call physicians and the rise of telemedicine in the 20 years since *Irvin* was decided, see 89 Fordham L. Rev. at 303, appellate courts in a number of jurisdictions have examined anew how the duty of care for medical practitioners should be defined and have endeavored to outline more cohesive tests than what Kansas common law now provides. For example, in *Kelley*, the Tennessee Supreme Court recognized that a consulting physician may create an actionable, though implied, doctor-patient relationship with an individual he or she never meets by "affirmatively undertak[ing] to diagnose and/or treat a person, or affirmatively participat[ing] in such diagnosis and/or treatment." 133 S.W.3d at 596. More recently, the Oregon Supreme Court similarly found that an on-call physician who does not see a patient may, nonetheless, form an implied doctor-patient relationship if "the physician either knew or reasonably should have known that he or she was diagnosing the patient's condition or providing treatment to the patient." *Mead v. Legacy Health System*, 352 Or. 267, 279, 283 P.3d 904 (2012). The determination will be informed by the specific circumstances, including "the customary practice within the relevant medical community, the degree and the level of formality with which one physician has assumed (or the other physician has ceded) responsibility for the diagnosis or treatment, the relative expertise of the two physicians, and the reasonable expectations, if any, of the patient." 352 Or. at 278-79.

Those courts rely heavily on an element of foreseeability—whether the consulted or on-call physician knew or should have known the consulting physician would rely on the opinions as substantive diagnoses or treatment recommendations—in fashioning a test for doctor-patient relationships creating a duty of care. In 2019, the Minnesota Supreme Court went a step further and recognized a duty of care essentially based on foreseeability alone without requiring a traditional or implied physician-patient relationship. *Warren v. Dinter*, 926 N.W.2d 370, 375 (Minn. 2019). The court held: "[A] duty arises between a

14

physician and an identified third party when the physician provides medical advice and it is foreseeable that the third party will rely on that advice" and that professionally substandard advice may cause harm. 926 N.W.2d at 376. Acknowledging its treatment of medical negligence to be uncommon, the *Warren* court found support in earlier Minnesota cases and what it characterized as analogous authority in four other states. 926 N.W.2d at 377 & n.6.

We neither presume to endorse nor apply any of those decisions and confine ourselves to the precepts that may be derived from Kansas authority, primarily as stated in *Adams*, *Irvin*, and *Russell*. The somewhat fragmentary state of the law complicates the tasks facing practitioners and district courts, including presenting and resolving dispositive motions and, likely, instructing juries. Although that law may be less than analytically comprehensive, we conclude there are sufficient points of distinction between the circumstances here and those in *Irvin* to require a different result at this stage in the litigation. As we explain, there are adequate facts, taking the evidence in the best light for Miller, to preclude summary judgment.

On summary judgment, Dr. Isaac endeavored to draw his consultation with Dr. Jia into the realm of a curbside exchange that created no physician-patient relationship with Miller. To successfully resist the effort, Miller simply must point to evidence that would permit a reasonable jury to find there was such a relationship. We do not have to be persuaded a given jury *would* come to that conclusion—only that it fairly might. *Estate of Belden*, 46 Kan. App. 2d. at 276 (In reviewing summary judgment granted a defendant, the appellate court asks whether "a reasonable jury *might* render a verdict for" plaintiff and "do[es] not consider the probability of such a verdict, only its possibility."); see *Fusaro v. First Family Mortg. Corp.*, 17 Kan. App. 2d 730, 735, 843 P.2d 737 (1992) (defendant's summary judgment motion should be denied if submissions contain sufficient evidence so that "a jury might reasonably find for the plaintiff"); *Cullison v.*

15

*City of Salina*, No. 114,571, 2016 WL 3031283, at *6 (Kan. App. 2016) (unpublished opinion). Miller crosses that comparatively low threshold.

• The communication between Dr. Jia and Dr. Isaac took place in an established framework unlike a customary curbside consult and bore earmarks of formality. First, Dr. Jia contacted Dr. Isaac because he was the hospital's designated on-call neurologist. Although being "on-call" does not itself create some sort of physician-patient relationship, being called could depending on the exchange of information that follows. Conversely, in a prototypical curbside consultation, the consulting physician buttonholes a colleague (sometimes a specialist, sometimes not) to "run something by" the consulted physician. The consulted physician has no reason to expect the inquiry and may be chosen because of a collegial relationship with the consulting physician, a sound reputation in the professional community (as was true in *Irvin*), or mere happenstance, e.g., being present in the lounge. Viewed benignly, those informal exchanges provide some check that the consulting physician hasn't overlooked a fair possibility in making a differential diagnosis or in assessing a patient's treatment options.

Here, as the on-call neurologist, Dr. Isaac expected the type of call he received from Dr. Jia. He had an agreement with the medical center to provide that service. Dr. Isaac knew Dr. Jia was in the midst of treating a patient. Dr. Jia outlined the patient's symptoms, relevant clinical history, and a possible diagnosis and course of care—discharge with no immediate treatment and a referral for Miller to see Dr. Isaac the next day. The exchange was not a casual one occurring at a time and place removed from the consulting physician's interaction with the patient.[2]

[2] In this respect, the *Irvin* decision creates an unhelpful labeling that draws a legal distinction between "formal" and "informal" medical opinions. A formal opinion flows from a meeting between the doctor and the patient; a review of a chart, test results, and medical history; and a physical examination—all leading to a diagnosis and treatment or a referral to another physician. Rendering a formal opinion creates a doctor-patient

16

relationship. Conversely, an informal opinion is something less than a formal opinion typified by a curbside consultation and does not create a doctor-patient relationship. That binary differentiation, even as a first cut rather than a legally determinative one, seems almost obtusely indifferent to the varied factual circumstances attendant to medical consultations. Although broad labeling may be a risky endeavor, a better starting place may be dividing "professional" opinions from "casual" opinions of the sort recognized as curbside consultations. A professional opinion, rendered through a formalized process commonly with some documentation, would be a necessary condition for a doctor-patient relationship. Returning an after-hours call from a patient acting as a proxy for an immediate family member in distress, as in *Adams*, may be sufficiently formal when the physician then offers a medical opinion.

• Participating in ad hoc curbside consults, either as the consulting physician or the consulted physician, is an accepted, if unregimented, aspect of medical practice. So the consulted physicians offer their off-the-cuff views without compensation and in the loose expectation of a reciprocal professional courtesy should they seek out a curbside consultation. Nothing more.

Dr. Isaac's involvement here was markedly different. He had a set arrangement with the medical center requiring him to be available on call 10 days a month, and his practice partner had to cover an additional 10 days a month. The neurologists provided the on-call coverage as a condition for admitting their patients to the medical center—a thing of value. The neurologists and the medical center exchanged on-call services for admitting privileges in a mutually beneficial agreement. Their arrangement may not have been reduced to writing with a slew of provisos and conditions, but it was formalized through the unbroken performance of the interlocking obligations over time.

Dr. Isaac, therefore, consulted with Dr. Jia because of his established and specific obligation to the medical center rather than as a part of a convention of the medical profession encouraging informal discussion between practitioners. At the summary judgment stage, we may infer the arrangement required and the medical center expected Dr. Isaac to provide thorough and carefully reasoned assessments in his capacity as an

on-call physician. See *Crabb v. Swindler, Administratrix*, 184 Kan. 501, Syl. ¶ 2, 337 P.2d 986 (1959); see also *David v. Hett*, 293 Kan. 679, 696-97, 270 P.3d 1102 (2011). And that requirement would inure to the practical, if not the legal, benefit of the patients.

• An informal opinion of the sort provided in a curbside consultation typically is neither documented nor conveyed to the patient. It functions mostly as a hedge against a gross oversight on the part of the consulting physician. Here, the facts as we must take them, are quite different and portray a much more formal and professional exchange between Dr. Jia and Dr. Isaac.

As we have already explained, Dr. Jia contacted Dr. Isaac precisely because he was the on-call neurologist and in that capacity had years of experience and specialized medical training and practice Dr. Jia did not as a much younger emergency room physician. Dr. Jia was looking for guidance beyond a typical curbside consultation. As we have said, he described Miller's salient symptoms and history to Dr. Isaac and outlined his diagnosis of a complex migraine and possibly his recommendation to forego a CT scan. Dr. Isaac then lent *his* professional expertise to confirm Dr. Jia's conclusion about the cause of Miller's symptoms and apparently endorsed dispensing with additional diagnostic testing.

Even the time of the call—about 11 p.m.—suggests a purpose of more substance and urgency than the classic casual curbside consultation. Dr. Jia sought a specialist's studied assessment of a patient who might be experiencing symptoms of a relatively benign, if uncomfortable, headache or of a potentially life-threatening stroke. He wanted something more than an informal opinion. And while an on-call physician would anticipate fielding inquiries outside of usual business hours, he or she presumably ought to consider a late-night inquiry from the emergency room to be of immediate importance to the doctor making the call and the patient.

Again, we may (and really must on summary judgment review) infer that Dr. Isaac knew Miller and her husband remained in the emergency room, so he could have spoken to either of them directly or solicited additional information from them through Dr. Jia. He also would have understood that because Miller had not been released, Dr. Jia's clinical assessment had not been implemented and easily could have been changed without, for example, requiring Miller to return to the medical center. In some strict literal sense, Dr. Isaac did not offer a diagnosis of or treatment plan for Miller but only because he concurred with Dr. Jia. His agreement entailed a professional opinion not unlike the physician's conclusion in *Adams* that the young woman's abdominal cramping likely was a normal side effect of her pregnancy rather than a medical emergency and, thus, required no further diagnosis or immediate treatment.

Two other factual circumstances tend to separate this case from the sort of informal opinions the court discussed in *Irvin*. First, the Millers explicitly asked Dr. Jia to get a second opinion from the on-call neurologist. The summary judgment record is silent on whether Dr. Jia conveyed their request to Dr. Isaac in so many words. But, as we have said, Dr. Isaac knew they remained at the medical center and were waiting on his discussion with Dr. Jia. Second, Dr. Jia documented the substance of his consultation with Dr. Isaac in Miller's medical chart and orally informed the Millers of Dr. Isaac's medical opinion. The documentation and dissemination of Dr. Isaac's conclusion lends the consultation a formality absent from curbside consults and similar informal discussions among medical peers. Those characteristics also would be consistent with a doctor-patient relationship between Dr. Isaac and the Millers, albeit one established through Dr. Jia.

Viewed in its entirety and favorably to Miller, the summary judgment record would permit a jury to conclude Dr. Isaac formed at least an implied physician-patient relationship with Miller arising from his consultation with Dr. Jia. See *Adams*, 270 Kan. at 835. The professional exchange had indicia of formality missing from curbside

19

consultations that do not implicate such a relationship between a patient and the consulted physician. Prominent among those indicators are the Millers' request for the consultation, their remaining at the emergency room while Dr. Jia consulted with Dr. Isaac, and the formal documentation of the consultation in the patient chart and its oral communication to the patient.

We, therefore, reverse the district court's summary judgment for Dr. Isaac's estate and remand for further proceedings consistent with this opinion. In doing so, we say no more than the available evidence was sufficient, first, to create a jury question and, second, to permit the finding of a doctor-patient relationship as a reasonable implication drawn from that evidence. We should not be understood to be ruling that's the only implication. We, likewise, express no view on any other issue in this litigation.

Reversed and remanded for further proceedings.